DAMASIEWICZ *v.* GORSUCH ET AL.

[No. 116, October Term, 1950.]

418

*Decided March 16, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MAR-KELL, JJ.

*Marion A. Figinski* for the appellant.

*Theodore Sherbow,* with whom was *James J. Lindsay* on the brief, for Daniel T. Gorsuch.

*J. Gilbert Prendergast,* with whom were *Clark, Thom-sen & Smith* on the brief, for Millard W. Hammond.

MARBURY, C. J., delivered the opinion of the Court.

The question in this case is whether a child, suffering prenatal injuries inflicted through the negligence of others, can bring a suit against such others for its damages. Appellant here, an infant, by his father and next friend, alleged in his declaration that his mother was riding in an automobile operated by one of the defendants, and

that this automobile was struck by another, operated by the other defendant. As a result, the appellant, then *en ventre sa mere,* was prematurely born and is now suffering with permanent injuries causing him to lose the sight of both of his eyes. He claims the drivers of both automobiles caused his injuries by their negligence, and asks for damages against them. Demurrers were filed by both defendants. These demurrers were sustained by the trial court, without leave to amend, and judgment was entered in favor of both defendants for costs. From this judgment the plaintiff appeals.

In the Seventh Part of the Reports of Sir Edward Coke, published in 1738, there is contained at folio 7 the Earl of Bedford's case, Michaelmas Term (1586), 28 and 29 Elizabeth. The Earl had died, leaving two granddaughters, both of whom were under age, and the questions involved were very technical matters involving the right of the King to void certain leases of the Earl's land during the time the granddaughters were in ward. In the course of the report and discussion of the case, Lord Coke made many illustrative statements, one of which was: "* * * if Tenant in Tail makes a Lease for 30 or 40 Years, rendering Rent, which is avoidable by the Issue in Tail, and afterwards Tenant in Tail dies without Issue, his Wife with Child with a Son, by which the Donor enters, and as to him avoids the Lease, and afterwards the Son is born, the Lessee re-enters, the Son at his full Age may by Acceptance of the Rent affirm the Lease". Then follows: "And altho' *filius in utero matris, est pars vicerum matris,* (vide 3 Ass. pl. 2, 22 Ass. pl. 94. 22 Edwardi tertii Corone 180. Stamford 21.) yet the Law in many Cases hath Consideration of him in Respect to the apparent Expectat. of his Birth." This seems to have been the earliest statement on the subject found in the English reports.

In Blacksone's Commentaries (1765), Book 1, Chapter 1, pp. 129, 130, is found the following:

"Life is the immediate gift of God, a right inherent

by nature in every individual; and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb. For if a woman is quick with child, and by a potion or otherwise, killeth it in her womb; or if anyone beat her, whereby the child dieth in her body, and she is delivered of a dead child; this, though not murder, was by the ancient law homicide or manslaughter. But the modern law doth not look upon this offence in quite so atrocious a light, but merely as a heinous misdemeanor.

"An infant *in ventre sa mere,* or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a legacy, or a surrender of a copyhold estate, made to it. It may have a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then actually born. And in this point the civil law agrees with ours."

In the case of *Wallis v. Hodson,* reported in 2 *Atkyn's Chancery Reports* 114, an infant sued for the estate of her grandfather. He died in 1724 leaving an only son who died within a week after his father, leaving a widow. The plaintiff, who was the daughter of the son, was unborn at that time, but was born about five months later. Lord Hardwicke said:

"The principal reason I go upon in the question is, that the plaintiff was *in ventre sa mere* at the time of her brother's death, and consequently a person *in rerum natura,* so that both by the rules of the common and civil law, she was, to all intents and purposes, a child, as much as if born in the father's lifetime.

"*First,* As to the common law, there is the trite case of an infant *in ventre sa mere* being vouched in a common recovery; a mother also may justify the detaining of charters on behalf of it; a devise to him is good, by the opinion of *Treby* and *Powell,* in *Scatterwood* and *Edge,* 1 *Salk* 229, a bill may be brought in his behalf, and this court will grant an injunction in his favour to stay waste, 2 *Vern.* 710. *Musgrave versus Parry et al'.*
* * *

*"Secondly, As to the civil law,* nothing is more clear, than that this law considered a child in the mother's womb absolutely born, to all intents and purposes, for the child's benefit.

*   *   *   *   *

"The last passage in the *Digest* is more explicit than any other; but then it makes a difference between a child *in ventre sa mere in esse* at the father's death, and only *conceived,* the latter is not considered as having any relation to the intestate, being, according to a term made use of there, not *animax."*

In the case of *Thellusson v. Woodford,* (1798-1799) 4 Vesey, Jr. 227, there are pages of discussion by counsel and the justices of the rights of an unborn child to take under a will. Justice Buller said:

"The next objection is, that, supposing, he meant a child *en ventre sa mere,* and had expressly said so, yet the limitation is void. Such a child has been considered as an non-entity. Let us see, what this non-entity can do. He may be vouched in a recovery, though it is for the purpose of making him answer over in value. He may be an executor. He may take under the Statute of Distributions. He may take by devise. He may be entitled under a charge for raising portions. He may have an injunction; and he may have a guardian. Some other cases put this beyond all doubt. * * *

"In *Doe v. Clarke,* the words 'that whereever such consideration would be for his benefit, a child *en ventre sa mere* shall be considered as absolutely born' were used by me, because I found them in the Book, from whence the passage was taken. But there is no reason for so confining the rule. Why should not children *en ventre sa mere* be considered generally as in existence? They are entitled to all the privileges of other persons."

Then, after discussion of the earlier cases, he said: "The Court have gone farther. They have held, that a child *en ventre sa mere* is to be considered as in being. It is immaterial, therefore, whether he is born, or not."

Other cases which decided that an unborn child may inherit are *Doe dem. Clarke v. Clarke* (1795), 2 Blackstone 399, and *Trower v. Butts* (1823), I Simons & Stuart 181.

In the case of The George and Richard, L. R. III, Admiralty and Ecclesiastical 466, decided in 1871, an unborn child was held entitled to share in the damage caused by a collision between two ships, and its proctor had a right to a claim, although, until the child was born, a reference could not be made. Sir Robert Phillimore, who delivered the opinion, in discussing the matter, said: "It has been argued, that the peculiar language of Lord Campbell's Act requires the actual existence of the claimant as a condition precedent to a right of action. I am not of this opinion. Although, as has been said, twenty-five years have passed since Lord Campbell's Act, and this particular question has not arisen for decision, it seems to have been considered in one case as within the purview of this statute." The case cited was *Blake v. Midland Railway Co.*, 18 Q. B. 93, 109.

The admiralty case, and the cases involving the construction of wills and the rights of inheritance are largely based upon the civil law which was administered in the Ecclesiastical courts. Lord Hardwicke's statement in *Wallis v. Hodson, supra,* covers both the civil and common law; but that was a case under the Statute of Distributions. The history of that statute shows that its main object was to make the jurisdiction of the Ecclesiastical courts more extensive than was allowed by the common law. *Villar v. Gilbey*, L. R. (1907) A. C. 139, 149.

There does not seem to have been any case either in England or in America which passed upon the right of an unborn child to recover damages for a tort until the case of *Dietrich v. Inhabitants of Northampton*, 138 Mass. 14, decided in 1884. The opinion in that case was written by Justice Oliver Wendell Holmes, then sitting on the Supreme Judicial Court of Massachusetts. The case was a suit by the administrator of a child, which was born prematurely as a result of the fall of its mother

on a highway of the town of Northampton. The child was not directly injured, but the shock to its mother caused the premature birth and it was unable to survive, although it lived for ten or fifteen minutes after birth. Suit was brought under a statute imposing liability on the township. Justice Holmes cited the rule of criminal liability laid down by Lord Coke, although he expressed some doubt that this represented the common law, and then said: "For, even if Lord Coke's statement were the law of this Commonwealth, the question would remain whether the analogy could be relied on for determining the rule of civil liability. Some ancient books seem to have allowed the mother an appeal for the loss of her child by a trespass upon her person. Abbrev. Plac. 26, col. 2 (2 Joh.) Lincoln rot. 3. Fleta, I. c. 35, § 3, and Sir Samuel Clarke's note, citing 45 H. III, rot. 22. Which again others denied. 1 Britton, (Nichols's ed.) 114. See Abbrev. Plac. 295, col. 2 (29 Ed. I.) Norht. rot. 43. Kelham's Britton, 152, n. 14." Then, after some further discussion, he concluded: "Taking all the foregoing considerations into account, and further, that, as the unborn child was a part of the mother at the time of the injury, any damage to it which was not too remote to be recovered for at all was recoverable by her, we think it clear that the statute sued upon does not embrace the plaintiff's intestate within its meaning * * *". It will be noted that, while Justice Holmes cites no case, his decision is based upon the same theory stated by Lord Coke in the Earl of Bedford's case, namely, that until birth, the child is a part of the mother.

Within a few years of Justice Holmes' decision, a case was decided in the Irish courts, *Walker v. Great Northern Railway,* (1891) 28 L. R. Ireland 69. In that case, the mother of the unborn child was a passenger on the defendant's railway, and it was claimed that by negligence of the railway company, the child was permanently injured, crippled and deformed. After her birth, the suit was brought, and a demurrer was filed. Opinions were filed by four justices, all of whom discussed the

question, and sustained the demurrer. The ground for the decision, however, was not that the unborn child was a part of its mother, which, as we have shown, was the basis of Justice Holmes' decision. The Irish justices all based their decision upon the point that it was not a case of trespass, but was a case of breach of duty of the carrier to its passengers. The passenger was the mother, and not the child; the carrier knew nothing about the child, and, in so far as the carrier was concerned, it was a nonentity and no present duty to it could be inferred. Chief Justice O'Brien, in his opinion, quoted from *Thellusson v. Woodford, Wallis v. Hodson, Doe v. Clarke,* and The *George* and *Richard, supra,* and then specifically declined to decide that a person could not be held for a tort *willfully* committed on an unborn child, but based his decision on the ground already indicated. He said:

"Now these are substantially the authorities referred to on behalf of the plaintiff; and having regard to these authorities, I wish it to be clearly understood that in deciding this case I do not intend to go this length, *viz.* that if a person knowing that a woman is *enceinte* wilfully inflicts injuries on her with a view to injuring the child, and the child is born a cripple, or after its birth becomes a cripple, owing to the injuries so wilfully inflicted, an action does not lie at the suit of the child so crippled. I am far from saying that such action would lie under such circumstances at the suit of the child when born; but before I would hold an action under such circumstances did not lie, I would desire to hear further discussion as to the limitations of the rule that a child *in utero* is considered as actually born when it is necessary for the benefit of such unborn child so to consider it.

"I would like to have it further discussed whether that rule is limited to taking benefits by succession and bequest, or whether it would apply to a case where the child has been so wilfully injured in the womb that it is born a cripple, or becomes one after its birth, and is thereby permanently deprived of the ability to earn

a livelihood. In the case I put, it would be manifestly for the benefit of the child that it should be considered as born at the time the injuries were inflicted, and that an action could be maintained."

In *Allaire v. St. Luke's Hospital*, 1900, 184 Ill. 359, 56 N. E. 638, 640, 48 L. R. A. 225, the expectant mother of the plaintiff had gone to a hospital for the purpose of delivery of her child. Four days before the child was born, the hospital elevator, in which she was a passenger, got out of control and not only injured her, but injured the child so that when he was born, his left limb, left side, and left hand were wasted and shortened, and he was crippled for life. The mother settled her case against the hospital for damages, but the child brought suit and a demurrer to his declaration was sustained. The court, in a *per curiam* opinion, discussed *Dietrich v. Inhabitants of Northampton, supra,* and *Walker v. Railway Co., supra,* and said: "That a child before birth is, in fact, a part of the mother, and is only severed from her at birth, cannot, we think, be successfully disputed. The doctrine of the civil law and the essclesiastical and admiralty courts, therefore, that an unborn child may be regarded as in *esse* for some purposes, when for its benefit, is a mere legal fiction, which, so far as we have been able to discover, has not been indulged in by the courts of common law to the extent of allowing an action by an infant for injuries occasioned before its birth." Justice Boggs wrote a dissenting opinion which is one of the ablest on record on the plaintiff's side of the case. He started by conceding that there was no similar case at common law, but quoted Lord Mansfield and Cooley on Torts to the effect that the growth of the common law is the application of general principles to new sets of facts. He said:

"A *foetus* in the womb of the mother may well be regarded as but a part of the bowels of the mother during a portion of the period of gestation; but if, while in the womb, it reaches that prenatal age of viability when the destruction of the life of the mother does not neces-

sarily end its existence also, and when, if separated prematurely, and by artificial means, from the mother, it would be so far a matured human being as that it would live and grow, mentally and physically, as other children generally, it is but to deny a palpable fact to argue there is but one life, and that the life of the mother. Medical science and skill and experience have demonstrated that at a period of gestation in advance of the period of parturition the foetus is capable of independent and separate life, and that, though within the body of the mother, it is not merely a part of her body, for her body may die in all of its parts and the child remain alive, and capable of maintaining life, when separated from the dead body of the mother. If at that period a child so advanced is injured in its limbs or members, and is born into the living world suffering from the effects of the injury, is it not sacrificing truth to a mere theoretical abstraction to say the injury was not to the child, but wholly to the mother? * * *

"If, in the contemplation of the common law, life beings as soon as the infant is able to stir in the mother's womb, and that an injury inflicted upon an infant while in the womb of the mother shall be deemed murder if the infant survive the wound during prenatal life, but succumbs to it, and dies from it after being born, and if every legitimate infant *in ventre sa mere* is to be deemed as born for all purposes beneficial to the child, why should it be supposed the common law would have denied to an infant born alive the right to recover damages for the injury inflicted upon it while in the womb of the mother? Had such injury, though inflicted on the child while in the mother's womb, been sufficient to cause the death of the infant after it had been born alive, the common law would have regarded the injury as having been inflicted upon a human being, and punished the perpetrator accordingly; and, that being true, why should the infant which survives be denied the right to recover damages occasioned by the same injury?"

Justice Boggs then concluded: "The law should, it seems to me, be that whenever a child in *utero* is so far advanced in prenatal age as that, should parturition by natural or artificial means occur at such age, such child could and would live separable from the mother, and grow into the ordinary activities of life, and is afterwards born, and becomes a living human being, such child has a right of action for any injuries wantonly or negligently inflicted upon his or her person at such age of viability, though then in the womb of the mother."

In 1901, the Supreme Court of Rhode Island had before it a case brought by the father and next-of-kin of a child which was injured before birth by the fall of plaster in a tenement rented by the plaintiff from the defendant. The child was prematurely born, and shortly afterward died. The action was brought under the state statute which was patterned after Lord Campbell's Act. The earlier cases were discussed, and the court said in its opinion: "one cannot maintain an action for injuries received by him while in his mother's womb; and consequently his next of kin, under the statute after his death, cannot maintain an action therefor". *Gorman v. Budlong*, 23 R. 1. 169, 49 A. 704, 707, 55 L. R. A. 118.

In *Nugent v. Brooklyn Heights Railroad Co.*, 154 App. Div. 667, 139 N. Y. S. 367, 368, decided in 1913 by the Appellate Division of the Supreme Court of New York, a child was injured thirty-six days before his birth by the negligent starting of a car. He was deformed, and the court said that even if the mother might recover for her mental pain, the mental pain the child would suffer, and the deformity, could not be included in her recovery, and the father, if he could recover at all, could do so only so far as the injury enlarged the expense of the child's maintenance and entailed loss of service. The court then said: "So, however the subject be viewed, there is a residuum of injury for which compensation cannot be had save at the suit of the child, and it is a question of grave import whether one may wrongfully deform or otherwise injure an unborn child without mak-

ing amends to him after birth." The earlier cases were discussed, particularly *Walker v. Great Northern Railway, supra,* and the court decided the case on the ground that the carrier owed no duty to the unborn child, as it was not a passenger. The carrier was held to be liable only for those who visibly offer themselves for carriage, and the recovery was denied. While the court noted the *Dietrich* and *Allaire* cases, it decided the case on the same ground as the decision in the *Walker* case. It may here be appropriately stated, however, that in a later case decided in the New York Court of Appeals in 1921, *Drobner v. Peters,* 232 N. Y. 220, 133 N. E. 567, 568, 20 A. L. R., 1503, the plaintiff's mother, while carrying him, fell into a coal hole in a sidewalk. Plaintiff was born eleven days later, and brought an action for damages. The court posed the question before it in the following words: "Does the present case permit the establishment by judicial decision of the rule that the innocent infant need not bear unrequited the consequences of another's fault? In the mother's womb he had no separate existence of his own. When born he became a person. He carried the injuries out into the world with him. His full rights as a human being sprang into existence with his birth. No longer may it be urged that the mother alone is injured. The presence of the injured child refutes that theory. Did he succeed to his mother's rights?" and then answered it: "May this court attach an unnatural meaning to simple words and hold independently of statute that a cause of action for prenatal injuries is reserved to the child until the moment of its birth and then accrues? The formulation of such a principle of legal liability against precedent and practice may be a tempting task to which sympathy and natural justice point the way, but I cannot bring myself to the conclusion that plaintiff has a cause of action at common law. The injuries were, when inflicted, injuries to the mother. No liability can arise therefrom except out of a duty disregarded, and defendant owed no duty of care to the unborn child in the present case apart from the duty to

avoid injuring the mother." In that decision, six justices concurred, but Judge Cardozo dissented, although, unfortunately, he did not file an opinion.

In 1913, the Supreme Court of Missouri decided a case in which, in September, the mother of a child was a passenger on a street railway. When she was leaving, the car was negligently put in motion, throwing her to the ground, and injuring the arm and body of her unborn child. The child was born in December and died, allegedly from his injury, the following July. A suit was brought by the father and mother. This was *Buel v. United Railway Co.*, 248 Mo. 126, 154 S. W. 71, 45 L. R. A., N. S., 625. The case was brought under a statute which gave right of action to a father and mother for the death of a child, a variation of Lord Campbell's Act. The court held that in the case of a child injured before birth, no right of action accrued to it after birth by common law, and there was no prior right to sue which the statute could take hold of and cause to survive the death of the person injured.

In 1916, the Supreme Court of Wisconsin had before it the case of *Lipps v. Milwaukee Electric Ry. & Light Co.*, 164 Wisc. 272, 159 N. W. 916, 917, L. R. A. 1917B, 334. This was an action by a guardian *ad litem* to recover damages for personal injuries sustained in defendant's car by plaintiff while a *foetus en ventre sa mere* at the age of about five months and before she could be born viable. It was claimed that she suffered from epileptic fits as a direct result of the prenatal injuries. The court discussed the preceding cases, but based its decision on the fact that the child at the time it was injured could not have been born viable, saying: "We go no further than the facts of the case require, and hold that no cause of action accrues to an infant *en ventre sa mere* for injuries received before it could be born viable.

"Very cogent reason may be urged for a contrary rule where the infant is viable, and especially so in cases where the defendant, being a doctor or midwife, has

negligently injured an unborn child. As to such cases we express no opinion."

The Court of Appeals of Louisiana in 1923 decided the case of *Cooper v. Blanck,* 39 So. 2d 352, in which the parents of a child which had died after a premature birth caused by a prenatal injury when plaster fell upon its mother, sued the landlord of the premises. The court decided the case in favor of the plaintiffs under the provisions of the civil law which it stated was the basis of the Louisiana jurisprudence.

In the case of *Stanford v. St. Louis-San Francisco RR. Co.,* 1926, 214 Ala. 611, 108 So. 566, which was a suit by the personal representatives of an infant dying as a result of prenatal injuries wrongfully received, the court, on the strength of the cases we have previously discussed, denied the right of the representatives of the child to bring the suit, stating: "The authorities, however, are unanimous in holding that a prenatal injury affords no basis for an action in damages, in favor either of the child or its personal representative."

The Supreme Court of Canada had a case before it in 1933, *Montreal Tramways v. Leveille,* 4 D. L. R. 337, in which the mother of the child was thrown from the car to the street and injured. Two months later the child was born with club feet which, it was claimed, was the result of the injury. A judgment was obtained, and affirmed by the Court of King's Bench, and then appealed. The case was determined by the civil law of Quebec. The court cited some of the *English* cases and the *American* cases which we have heretofore discussed, and said that it must be admitted that the great weight of judicial opinion in the common law courts denies the right of a child to maintain an action for prenatal injuries. Under the civil law, however, the court held that the wrongful act of the company produced its damage on the birth of the child, and the right of action was then complete, and recovery was based, not upon the ground that the company failed to perform its contract of carriage with the mother, but on the ground that it committed an indepen-

dent tort against the child. The appeal, therefore, was dismissed.

The Texas Supreme Court decided in 1935 the case of *Magnolia Coca Cola B. Co. v. Jordan,* 124 Texas 347, 78 S. W. 2d 944, 97 A. L. R. 1513. This was an automobile accident in which the mother was injured and caused to give premature birth to twin babies who died as a result of their injuries after living nineteen days. The court held that no action could be maintained by parents on account of the death of a child, unless the child could maintain such action after its birth, which it denied. In 1937 the Supreme Court of Michigan decided the case of *Newman v. City of Detroit,* 281 Mich. 60, 274 N. W. 710, 711. The mother in that case was a passenger on a streetcar. The injury occurred twenty-two days prior to birth, and the child died three months after birth. The court held the overwhelming weight of authority opposed the right to bring the action and denied it. In answer to the arguments that where there is a wrong, there should be a remedy, and that the question of causation is a matter of proof as in other actions for negligence, the court said: "These arguments may well be addressed to the legislature." The Supreme Court of Pennsylvania had before it in 1940 the case of *Berlin v. J. C. Penney Co.,* 339 Pa. 547, 16 A. 2d 28, and held that in the absence of statute, no cause of action for prenatal injury to a child accrues at birth. This case overruled without mentioning it an earlier case in a Pennsylvania trial court which had decided otherwise. *Kine v. Zuckerman,* 4 Pa. Dist. & Co. R. 227.

The case of *Scott v. McPheeters,* 33 Cal. App. 2d 629, 92 P. 2d 678, 679, 93 P. 2d 562, was decided in 1939 by the District Court of Appeals of California. That was an action for damages against a physician for negligent use of clamps and forceps incident to the delivery of a child, resulting in injuries to the brain cells and spine. The suit was brought by the mother, as guardian, for these injuries sustained prior to its birth. The child at the time of the suit was eleven years old.

The court allowed the suit on the basis of a statute which provided: "A child conceived, but not yet born, is to be deemed an existing person, so far as it may be necessary for its interests in the event of its subsequent birth." Also in 1939, a similar question came before the appellate court of Illinois in *Smith v. Luckhardt*, 299 Ill. App. 100, 19 N. E. 2d 446, 450. That case was brought thirteen years after the birth of a child, against physicians who were claimed to have negligently treated the mother by X-ray treatments over a period of four months, and until the child was seven months mature. These treatments were claimed to have damaged the child to such an extent that she was born a permanent cripple and feeble-minded. The court discussed the matter at some length, citing authorities and the contentions made on behalf of the child. It denied it the right to maintain the action, stating: "Appellee further contends that where there is a wrong, there should be a remedy, and claims that the question of causation is a matter of proof, the same as in other actions for negligence. These arguments may well be addressed to the legislature."

In the New Jersey case of *Stemmer v. Kline*, 1942, 128 N. J. L. 455, 26 A. 2d 489, 684, 686 which was a suit for malpractice against a physician by a child which was then six years old, incapable of speech or action, and without sight or hearing, it was contended that this condition was brought about by improper treatment before birth. The court said that it concluded that there was no right of action at common law, and no statute in New Jersey, and therefore there should be a judgment for defendant. Ten judges were for reversal which favored defendant, and five for affirmance, the later including the chief justice. Concurring and dissenting opinions are found commencing on page 684 of 26 A. 2d. Chief Justice Brogan who dissented said that it was no answer to say that there was no remedy because the cause of action was not written down in the common law in precise terms. He concluded that

the right of action was implicit in the common law unless it was admitted that the law had no remedy for a grevious wrong. He said *Dietrich v. Inhabitants of Northampton, supra,* was based upon a premise which was not true as a matter of elementary physiology: "While it is a fact that there is a close dependence by the unborn child on the organism of the mother, it is not disputed today that the mother and the child are two separate and distinct entities; that the unborn child has its own system of circulation of the blood separate and apart from the mother; that there is no communication between the two circulation systems; that the heart beat of the child is not in tune with that of the mother but is more rapid; that there is no dependence by the child on the mother except for sustenance." He also discussed the case of *Walker v. Great Northern Railway, supra,* and the cases following it, and said that the real reason for these holdings was a rule of convenience because it was feared there would be many cases founded on fraud, and possible injustice might result. He said the principle involved in the case before him should be decided in rules of reason and not of convenience or lack of authority.

The Court of Civil Appeals of Texas, in the case of *Lewis v. Steves Sash & Door Co.,* 177 S. W. 2d 350, decided in 1943, held in a negligence case where a child was born dumb, that no recovery could be allowed, following the case of *Magnolia Coca Cola B. Co., v. Jordan, supra.* In 1946, the District Court of the United States for the District of Columbia had a case before it in which the question was whether an infant had a right of action springing from the alleged fact that it was taken from its mother through professional malpractice, with resulting consequences of a detrimental character. The court there attempted to make a distinction between the *Dietrich* case and the case before it, in which the child was viable at the time of the injury. The court held that there was a right of recovery. *Bonbrest v. Kotz,* 65 F. Supp. 138.

In 1949, the Supreme Court of Ohio had before it the case of *Williams v. Marion Rapid Transit,* 152 Ohio St. 114, 87 N. E. 2d 334, 340, 10 A. L. R. 2d 1051. In that case, a unanimous court held that in spite of the substantial authority to the contrary, such a suit could be maintained. It held that no legislative action was required authorizing recovery for personal injury caused by the negligence of another. Such a right was one existing at common law. The plaintiff in the case had reached the period of viability when it was injured and the court held that to hold that such a child was part of its mother until birth would deprive the child of the right conferred by the Constitution upon all persons "by the application of a time-worn fiction not founded on fact and within common knowledge untrue and unjustified." Prosser on Torts, Chapter 5, Paragraph 31, pp. 188-189, was quoted. This quotation gave two reasons why nearly all the courts have denied recovery. One was that no duty of conduct could be owed to a person not in existence at the time, and the other that the difficulty of proving a causal connection between the negligence and damage was too great, and there was too much danger of fictitious claims. As to the second, Prosser said that adequate safeguards could be established by medical evidence, and as to the first, it was stated that medical authority has recognized long since that a child is in existence from the moment of conception, and "all writers who have discussed the problem have joined in condemning the existing rule" (citing authorities).

Also in 1949, the Supreme Court of Minnesota decided the case of *Verkennes v. Corniea,* 229 Minn. 365, 38 N. W. 2d 838, 841, 10 A. L. R. 2d 634. This was a malpractice suit for improper treatment of a maternity case. Both the mother and the child died. The court cited the majority cases, and the minority, and said there was no question about the viability of the unborn child, or its capacity for a separate and independent existence. It quoted with approval a statement in *Bonbrest v. Kotz,*

*supra,* that "the absence of precedence should afford no refuge to those who by their wrongful act, if such be proved, have invaded the right of an individual". It also cited as authority articles in 12 St. Louis Law Review 85, 61 Central Law Journal 364, and 33 Law Notes 205. The court was unanimous in holding that an action lay, and there is a statement at the conclusion of the opinion that the former opinion filed was withdrawn and the opinion as corrected was substituted. Whether this means that the court changed its mind is something we can only guess.

In 1950 the issue again arose in Ohio in the case of *Jasinsky v. Potts,* 153 Ohio St. 529, 92 N. E. 2d 809. This was on the question whether the administrator of a child who, when viable, suffered a prenatal injury due to the negligent act of another, and who died about three months after birth as a result, would have a cause of action under the wrongful death statute. The court unanimously held to its interpretation in the *Williams* case, saying that it did not change the common law in that case, but declared the law on that subject for the first time, and the presumption was that the rule announced in the *Williams* case had been the law at the time the wrongful death statute was enacted. It therefore held that there was a good cause of action stated.

The latest case we have found is *Bliss v. Passanesi,* decided in Massachusetts on November 14, 1950, and reported in 95 N. E. 2d 206, 207. The court referred to the *Dietrich* case as establishing the law in the Commonwealth of Massachusetts, and said it was not inclined to overrule it. It also discussed the dissenting opinions and the later cases to the contrary, and said of them: "The rationale of these decisions permitting recovery is that an unborn viable child is capable of an existence independent of its mother; that as the law recognizes an unborn child in protecting its property rights in the descent and devolution of property whenever it would be for the benefit of the child and also protects it as a legal entity in the criminal law, the law

should also recognize its civil rights for the infliction of injury due to the negligence of another; that a wrong should not go without redress; and that natural justice demands recognition of the legal right of the child to begin life unimpaired by physical or mental defects resulting from an injury due to the negligence of another while it was a viable child *en ventre sa mere.* We readily concede the strength of these grounds, but there is also strength in the arguments to the contrary, including that based upon the practical difficulty of reliable proof. *We do not intimate what our decision would be if the question were presented for the first time."* (Emphasis supplied.)

In addition to the articles relied on by the Minnesota court, attention may be called to an article in the Harvard Law Review, Vol. 63 (1949-1950), p. 173, in which the cases are discussed and a conclusion is reached that the fundamental reason for allowing a surviving child a right of action for prenatal injuries is the injustice of denying it. It is said that there should be recognized a legal right in the newborn child to begin life with a sound body.

Restatement, Torts, Chapter 42, Paragraph 89, states: "A person who negligently causes harm to an unborn child is not liable to such child for the harm." At the end of the comment is the following caveat: "The Institute takes no position upon the question whether there is liability to a child hurt while unborn by a person who intentionally or recklessly, and without excuse, harms the mother or child." No reason is suggested why there might be a distinction between a negligent injury and a willful injury.

The English authority on torts, Clerk and Lindsell, 10th Ed. (1947), p. 86, seems to be uncertain, saying: "An action for personal injuries will *perhaps* not lie at the suit of an infant which was *en ventre sa mere* at the time of the accident." (Emphasis supplied).

A consideration of these authorities leads to the conclusion that the majority of the courts are influenced by

Lord Coke's dicta, while the magazine writers and the judges in the later cases are inclined to a more realistic view, based upon modern medical science and general knowledge. Not all of the cases are, however, based upon the theory that an unborn child is a part of the mother for tort action purposes. There are a number of tangential arguments which may well be discussed before we reach the main question.

One of these is the argument of convenience, based upon the difficulty of proof. Cf. *Superior Transfer Co. v. Halstead*, 189 Md. 536, 56 A. 2d 706. It is probable that this would have been almost insurmountable in the days of Coke, Hardwicke and Blackstone, and perhaps of Holmes, and may have influenced their conceptions of the law. Physicians of today would have less trouble with the problem, but apart from this, the right to bring an action is clearly distinguishable from the ability to prove the facts. The first cannot be denied because the second may not exist.

Another suggestion, somewhat allied, is the fear that numerous faked or fraudulent claims will overwhelm the courts. This argument *ad terrorem* should have no weight to prevent legitimate claims from being heard. Fraud can be dealt with in this class of cases, just as in others, and the detection and the elimination of faked contentions present no novel question to judicial bodies. Here again, modern medical knowledge will do away with much of the difficulty.

There is also some thought that there is a difference between injuries caused willfully and those produced by mere negligence. See *Chief Justice O'Brien in Walker v. Great Northern, supra,* and *Restatement, supra.* This is, perhaps an attempt to ally civil rights with the criminal law. It is difficult to see why the same right does not exist in either case. The reason for the injury does not matter to the injured person—he is concerned only with the result. If the latter is the same in both cases, the same right of action should be given.

Some of the later cases attempt a distinction between a child which is viable and one which is not. See *Lipps v. Milwaukee E. Ry. & L. Co., supra.* This is an apparent effort to correct the early doctrine that the child is a part of the mother by bringing it more in line with known medical facts. Children are frequently born prematurely and live. And at times they have been removed from a dead mother and have survived. At some period in their growth they reach a stage where they can live apart from their mother. But, from a medical point of view, a child is alive within the mother before the time arrives when it can live apart from her. If it is injured at a time when, according to Blackstone, it is "able to stir in the mother's womb" there would seem to be just as logical a basis for allowing it to recover, as if it were injured after it had reached the period in its growth when it could be removed from the mother and live. In both cases it is alive, and in both cases there has occurred an injury to a living human being for which the responsible party should be made liable.

If a child is to be considered a part of its mother until birth, then the mother should be able to recover damages for injury to this part of her as well as for injuries to other parts. Yet there seems to be no case allowing such recovery. It was specifically denied in *Prescott v. Robinson,* 74 N. H. 460, 69 A. 522, 17 L. R. A., N. S., 594. If neither the child nor the mother can recover, then we have a serious case of *damnum absque injuria.* By the negligence or the willful misconduct of someone an unborn child has to go through life, crippled, blind, subject to fits, an imbecile, or otherwise changed from a normal human being. Yet the law provides no means for compensation for such a situation. It is no wonder so many judges have dissented from such decisions, and that some of the latest cases have disregarded them altogether.

We must determine what was the applicable common law of England as it existed on the Fourth of July, 1776, Art. 5, Declaration of Rights, *State v. Buchanan,* 5 Har.

& J. 317, *Gilbert v. Findlay College,* 195 Md. 508, 74 A. 2d 36, unless it has been changed by statute. There is no statute on the subject in Maryland. There is no decision on the subject here, and there is no decision in England, either before 1776 or afterwards. The *Chancery* case and the *Admiralty* case cited are based upon the civil law, which holds that a child in its mother's womb is born for all purposes for its benefit. Justice Holmes holds that, in Massachusetts at least, the child is a part of the mother, but he does not fail to see the result of that holding, and adds that damage to it "not too remote" is recoverable by the mother. However, there might be permanent injuries which would not develop until after birth. These would certainly be remote so far as the mother was concerned. This part of the opinion of the learned Justice does not seem to have been followed in any case, but the greater number of the jurisdictions in this country have held as he did on the question of the child's right of action, although not always, as we have shown, for the same reason. Those which hold that the common law view is that an unborn child is part of the mother are Massachusetts, Illinois, Rhode Island, New York, Missouri, Alabama, Texas, Michigan, Pennsylvania, and New Jersey. The Restatement adopts their conclusion. Those holding to the contrary are Ohio, Minnesota and the District Court of the District of Columbia. There is an intimation in New Hampshire, *Prescott v. Robinson, supra,* that it might also hold the contrary in a proper case. Louisiana, like the *Canadian* case, follows the civil law and California interprets a statute.

The only logical basis for denying recovery by a child for an injury while *en ventre sa mere* is that stated by Justice Holmes. He based it upon a common law which had no positive existence, but is derived from an isolated statement by Lord Coke, which is itself modified in the same sentence by the suggestion that the law in many cases has consideration for the unborn child by reason of the expectation of its birth. The will and inheritance cases recognize the rights of an unborn child,

and so do the criminal cases. His right to claim damages in admiralty is established. All of these may be under adaptations of the civil law to the common law, but when incorporated in it, they become part of the common law. If we were considering a case of first impression anywhere, we would be unable to find that the common law denied the right. On the contrary, it would appear that, in so far as there was any common law on the subject, the right would be recognized under the general theory, *ubi jus ibi remedium*.

It is *our* duty to determine what is the common law applicable to the circumstances and conditions of Maryland. *Gilbert v. Findlay College, supra.* We have not hesitated to differ with the majority rule in other cases where we found it to be wrong. *Mahnke v. Moore*, 197 Md. 61, 77 A. 2d 923. In view of the confused state of the law elsewhere, and the practically unanimous criticism of the majority cases by writers on the subject, and in view of the numerous dissenting opinions in these cases, we cannot regard them as compelling authority. When we examine the reasons behind them, we find them based upon an outworn point of view, now rejected by modern medicine, and rejected by the later cases. We think the modern view is the correct one, and, since there has heretofore been no occasion to decide what is our common law and we must for the first time decide it now, we think our decision should be made on the basis of present day knowledge. To hold otherwise would be a step backward, and would substitute a plebiscite of states for reason.

Such a holding does not usurp the legislative function, because we are determining now what the common law of Maryland always has been. If the question had been raised at the end of the 18th Century, it might have been decided differently, but if it had been so decided this would have been because of an ignorance of medical facts which are now common knowledge. The common law does not depend upon the knowledge of facts, although such knowledge, or the lack of it, may result in

different interpretations at different times. The law itself deals with rights, and since we now know that a child does not continue until birth to be a part of its mother, it must follow that as soon as it becomes alive it has rights which it can exercise. When it becomes alive is a medical question to be determined in each case according to the facts. Just because this is the first time for 175 years that the question has arisen in this court, does not make our conclusion judicial legislation.

For the reasons stated, the judgment will be reversed and the case remanded.

*Judgment reversed with costs.*

HENDERSON, J., delivered the following concurring opinion.

I agree with the conclusion reached by the Chief Judge in his exhaustive review of the authorities. However, since I arrive at the result by a slightly different route and the case is both novel and important, I think a few caveats are in order.

I attach little weight to the alleged progress of medical science. Obstetrics is probably the oldest branch of medicine, practiced continually since the first operation upon Adam's rib, and the fact that an infant may be delivered and survive, before the full period of pregnancy, was known to antiquity and is attested by the birth of the historical Julius Saesar and the legendary Macduff. Nor are we at liberty to substitute modern medical views for those of the common law, in cases where the common law rule is well established. The problem is to determine the common law rule.

The rule that a child is in existence from the moment of conception, applicable in testamentary situations, has no application here. It seems to stem from the ecclesiastical law, although a somewhat analogous rule was applied in the Earl of Bedford's case, a common recovery to dock the entail in accordance with principles of the land law which owed nothing to extraneous sources. Of

course, the common law is full of borrowings. The whole concept of adoption is said to have been lifted from the civil law. In any event, I base my argument upon the rule of the early criminal law, as stated by Coke and Blackstone, that a child *en ventre sa mere* is a person separate and separable from its mother. Murder and manslaughter are crimes against the person, and also torts. Indeed, the earliest form of reparation for such offenses was by money payments to relatives and dependents. Intentional torts were the only ones recognized until the comparatively recent concept of negligence was developed. The comments in the *Irish* case, and the caveat in the *Restatement,* seem to recognize, or at least leave open, the contention that recovery might have been had for an intentional prenatal injury at common law, as a trespass to the person, before trespass on the case was invented.

If this is a correct premise, several conclusions would seem to follow:  (1) the rule should not be applicable unless it is shown that the embryo has acquired a human personality and becomes viable. I do not understand from Blackstone's comment as to the time when a child becomes "quick" or "able to stir in the womb" that he visualized an intermediate period between conception and the period of viability, during which a child might be considered alive or "animax" for purposes of criminal liability. Liability in tort should extend no further. (2) The same reasoning that would support recovery for an intentional tort would support recovery for a negligent one, so far as the capacity of the child is concerned. But there may be important differences in the extent of the duty owed. Many authorities, including the Restatement, seem to limit recovery to the reasonable and foreseeable consequences of an unintentional act. Sometimes the thought is expressed in terms of legal duty, sometimes of proximate cause. Thus there may be a valid distinction in law as there is in fact between negligent injury by an obstetrician undertaking a delivery, and negligent injury by a carrier who may be wholly

unaware of the pregnancy of a passenger. I merely suggest the possibility of reconciling those lines of cases, neither of which is before us. (3) The doctrine of contributory negligence is an integral part of the concept of negligence. To what extent the child's right of action may be barred by negligence of the mother is another question that is left open because it was not argued in this appeal.

I agree that the rule of *stare decisis* has no application, in the absence of any decision in this State, or in the English reports. The decisions of other State courts, and the rule adopted by the Restatement, are not controlling, especially where we find a respectable, and growing, body of opinion to the contrary. It is unfortunate, however, that we are required to deal with the problem on demurrer, where allegations are necessarily general and may never be supported by the facts developed. I think it should be emphasized that we are now deciding only the general proposition and that all subsidiary questions are reserved.

MARKELL, J., delivered the following dissenting opinion, in which COLLINS, J., concurred.

On page 1 of Holmes's "Common Law", published about two years before he became a member of the Supreme Judicial Court of Massachusetts, is the often quoted statement, "The life of the law has not been logic; it has been experience." "Experience" in the law is primarily decision of cases. Mr. Justice Holmes, until late in life he made an exception of constitutional questions, adhered consistently to the doctrine and practice of *stare decisis*.

In *Detrich v. Inhabitants of Northampton*, 138 Mass. 14, the decision and the opinion were based not on "ignorance of medical facts" or "medical science", but upon knowledge of law. Medical facts and medical science are not mentioned, but to refute a statement ascribed to Lord Coke the opinion goes back to the Year Book of 1 Edward III. From a review of legal authorities it is

shown that the legal status of an unborn child is different in three branches of the law, property, crime, and personal injury. Incidentally the House of Lords, as recently as 1935, has reversed the Court of Appeals to apply a limitation to the almost universal rule that for the purpose of acquiring (but not transmitting) property rights an unborn child is regarded as *in esse* from the moment of conception. *Elliot v. Joicey (Lord)*, [1935] A. C. 209, 238-241.

Nor was the opinion in the *Dietrich* case based on ignorance of one of the central themes in Holmes's book— the concept of negligence in trespass and in case. The *Common Law*, pp. 79-107. In 1884 Holmes knew more about the common law, early and late, than I shall ever know. I am satisfied that the opinion in the *Dietrich* case was based on legally and historically sound foundations.

To undertake to decide, "on the basis of present day knowledge" of "modern medicine", differently from the way it would have been decided in 1776, what the common law was in England on July 4, 1776, and "always has been" in Maryland, seems not "realistic" but fantastic. The hundreds of judges of state courts of last resort are neither chosen nor qualified to assume legislative power over every question of law which has not been expressly decided in their own state. Of course, decisions in other states are not binding. But neither in theory nor in practice do American judges live or work in forty-eight separate idea-proof compartments. The *Restatement* of the law by the American Law Institute is a monument, erected at large expenditure of time and labor by law professors, judges and practising lawyers—and of money by one or more foundations—to the idea that in America there is a common law, and that it is something more than forty-eight digests of decisions. Judge Pound said, for the court, in *Drobner v. Peters*, 232 N. Y. 220, 223, 133 N. E. 567, 568, 20 A. L. R. 1503, "At common law a cause of action for personal injuries did not survive if death resulted from another's negligence or wrongful act. Lord Campbell's Act, passed

in England in 1846, and followed generally in this state (Code Civ. Proc. § 1905), was necessary to correct this omission. May this court attach an unnatural meaning to simple words and hold independently of statute that a cause of action for prenatal injuries is reserved to the child until the moment of its birth and then accrues?" The silence of the Maryland legislature for over three hundred years, sixty-seven years since *Dietrich v. Northampton*, I think, falls little short of an affirmative legislative acceptance of the common law as interpreted everywhere up to 1949. *State, for Use of Joyce v. Hatfield et al.*, 197 Md. 249, 78 A. 2d 754. As Mr. Justice Holmes said (in a tax case), "Upon this point a page of history is worth a volume of logic". *New York Trust Co. v. Eisner*, 256 U. S. 345, 349, 41 S. Ct. 506, 507, 65 L. Ed. 963.

We need not—indeed, before we take over the legislative function, we must not—shut our eyes to the possible practical consequences of our decisions. It may be true (but if it is, I do not judicially or actually know it) that "physicians of today would have less trouble with the problem", seemingly still obscure, of course of congenital ills. Legislators have been cautious about trying to bring the law into accord with "modern medical science", notably in the matter of sanity and criminal responsibility. Whether the persuasive abstract reasoning in the opinion of a plurality of the court should prevail over practical consequences that might result is properly a legislative, not a judicial, question.

I think the judgment below should be affirmed, in accordance with the decisions of the highest courts of Massachusetts, New York, New Jersey, Pennsylvania, Rhode Island, Illinois, Michigan, Wisconsin, and Alabama.

Judge COLLINS authorizes me to say that he concurs in this opinion.