STATE OF MARYLAND, for the Use of Valerie Yvonne WEAVER, individually, and as Mother and next friend of Margaret Yvonne Weaver, Vernon Proctor Weaver, Jr., and James Stephen Weaver, minors, and State of Maryland, for the Use of Patricia Jewell Weaver, infant, by Dorothy Jewell Wickham, her Mother and next friend, Intervenor,

v.

John LeRoy O'BRIEN and Thomas F. Chaney.

Civ. No. 7927.

United States District Court
D. Maryland, Civil Division.
April 13, 1956.

David I. Abse, Washington, D. C., and Jackson Brodsky, Bethesda, Md., for plaintiff.

Hal C. B. Clagett and Sasscer, Clagett & Powers, Upper Marlboro, Md., for intervenor.

Vance V. Vaughan, Brentwood, Md., and W. Hamilton Whiteford, Palmer R. Nickerson and Due, Nickerson, White-ford & Taylor, Baltimore, Md., for defendant Chaney.

No counsel appeared for defendant O'Brien.

THOMSEN, Chief Judge.

On March 8, 1954, about 5:15 P.M., O'Brien, who had been drinking, drove Chaney's dump truck onto the wrong side of a busy highway, and ran head-on into Weaver's automobile, killing Weaver. In this action, brought on behalf of Weaver's wife and children, Chaney moved for a directed verdict on the ground that O'Brien had departed from the course of his employment by Chaney and was on a frolic of his own at the time of the accident. I reserved ruling on this motion, and submitted to the jury special interrogatories, including:

(1) Was O'Brien guilty of negligence which caused the death of Weaver?

(2) Was O'Brien acting as agent or employee of Chaney and in furtherance of Chaney's interests at the time of the accident?

(3) Was Chaney negligent in entrusting his truck to O'Brien on the day of the accident?

The jury answered all of these questions "Yes"; but Chaney has moved for judgment n. o. v. It is conceded that O'Brien was negligent but Chaney contends that there was no evidence legally sufficient to go to the jury on the other issues.

The jury might properly have found the following facts from the evidence. In the winter of 1953–54, Chaney, who lived in Capitol Heights, Prince George's County, Maryland, near the District of Columbia line, owned a 1951 Chevrolet 2-ton dump truck, and was under contract to haul bank run gravel for the District Sand and Gravel Company, which has a gravel pit on Branch Avenue, about 3 miles southeast of the District line. Chaney drove the truck himself only occasionally, since he had another job. In November, 1953, he employed O'Brien to drive the truck. Chaney agreed to pay O'Brien one-third of what the truck grossed, Chaney to pay all expenses, including gasoline and repairs. At the time he employed O'Brien, Chaney asked him whether he had a license; when O'Brien said he had, Chaney did not ask to see it, nor inquire whether it was an operator's license or a chauffeur's license. The difference will be discussed below. Nor did Chaney ask O'Brien whether he had had any previous accidents. At first Chaney allowed O'Brien to keep the truck overnight, as well as to use it to get breakfast and lunch, but shortly after Christmas Chaney learned that O'Brien had been driving the truck in the evenings and on week-ends after he had been drinking, and thereafter required O'Brien to deliver the truck to Chaney's home each day after the last delivery had been made, and to pick it up again the next morning.

The truck was used to deliver gravel in the City of Washington and its suburbs, wherever the dispatcher of the District Company directed, within a radius of about 12 miles from the pit. After the truck was loaded, the driver was given a receipt ticket, to be signed by the customer, which the driver was required to turn in to the dispatcher if he was on duty, and to the office if he was not. The dispatcher usually left about 5 P.M., but the office stayed open later, and deliveries were sometimes made as late as 7 P.M.

After O'Brien was employed, the truck grossed only about $75 per week; this worried Chaney, and he asked his brother-in-law, who also drove for the District Company, to check up on O'Brien. Early one afternoon, shortly before the first of March, 1954, Chaney was told that the truck was parked at Props, a tavern on the Marlboro Road, three or four miles north of the pit. Chaney found O'Brien asleep in the cab of the truck, and accused him of being drunk. O'Brien denied that he was drunk, but admitted that he had been drinking. The rear spring of the truck was broken.

On March 8, 1954, O'Brien obtained the truck at Chaney's home about 6:30 A.M. Instead of going direct to the pit, he went into Washington, where he had breakfast and looked at want ads, with the idea of locating another job. He then went to a tavern and had a bottle of beer. Around 11 A.M. he picked up a load of bank run gravel at the pit and delivered it in Southeast Washington, some six and a half miles from the pit, as directed by the dispatcher. O'Brien returned to the pit, but did not turn in the ticket. He loaded the truck with pea gravel, and drove to Forestville, several miles east of the pit, where he sold the gravel to the owner of the Highway Market. He used the proceeds to pay a debt he owed to the proprietor of the Props, had "two beers" at that tavern, met an Air Force sergeant, visited Mike Young's and the Senate Inn, two other taverns on the Marlboro Road (Alabama Avenue) north of the pit, and spent the afternoon drinking. About 5 P.M. O'Brien became convinced that he should return the receipt ticket for the Washington delivery to the dispatcher or the office at the pit, although it could have been turned in the next day. Accom-

panied by the Air Force sergeant, he drove west on Alabama Avenue to Branch Avenue, and turned south toward the pit, some four miles away. The only reason O'Brien had for driving the truck south on Branch Avenue was to return the ticket to the representative of the District Company at the pit. While driving towards the pit on Branch Avenue, O'Brien recklessly tried to pass an automobile and drove the truck across the center line of the highway head-on into Weaver's car, killing Weaver. Besides some unopened beer bottles, a partly empty bottle of gin was found in the truck after the accident.

A. Was there any evidence legally sufficient to prove that Chaney was negligent in entrusting his truck to O'Brien on the day of the accident? There are two elements in this problem: (1) O'Brien's lack of a chauffeur's license, and (2) the likelihood vel non that O'Brien would operate the truck under the influence of alcohol.

(1) Article 66½ of the Annotated Code of Maryland, 1951 ed., sec. 111 provides:

> "(Permitting Unauthorized Person to Drive.) No person shall authorize or knowingly permit a motor vehicle owned by him or under his control to be driven upon any highway of this State by any person who is not authorized to operate such motor vehicle under this Article.

> "Violation of this section shall be deemed to be a misdemeanor * * *."

The Maryland law provides for three types of licenses to drive: (a) operator's license; (b) chauffeur's license; and (c) special chauffeur's license to operate a motor vehicle while in use as a public or common carrier of persons. Secs. 85–91. Sec. 85 provides in part: "No person shall operate a motor vehicle as a chauffeur unless he holds a valid chauffeur's license." O'Brien came within the definition of "chauffeur". Sec. 2 (a) (4). The essential difference between a chauffeur's license and an operator's license is that a chauffeur's license must be renewed every two years. Sec. 91. The requirements for operators' licenses and chauffeurs' licenses are set out in Secs. 87 and 89. The application blank for each requires answers to a number of questions: whether the applicant's right to operate a motor vehicle has ever been revoked, suspended or refused in any State or the District of Columbia; whether the applicant has ever been convicted of any violation in the operation of a motor vehicle; whether applicant has ever been treated for certain diseases; whether applicant has ever had a mental or physical incapacity or infirmity, etc.

The fact that a chauffeur's license must be renewed every two years implies that the Department of Motor Vehicles will satisfy itself every two years that the applicant continues to be qualified to operate a motor vehicle as a chauffeur. It must be presumed that the Department makes the necessary investigation and examination of such applicants. O'Brien had a Maryland operator's license but did not have a Maryland chauffeur's license; Chaney therefore violated Sec. 111 in permitting him to operate the truck.

Under Maryland law the mere violation of a statute does not support an action for damages, but it is evidence of negligence, and where such violation is the proximate cause of an injury, a right of action accrues to the party injured. Hopper, McGaw & Co. v. Kelly, 145 Md. 161, 169, 125 A. 779; Kelly v. Huber Baking Co., 145 Md. 321, 334, 125 A. 782; Cumberland & Westernport Transit Co. v. Metz, 158 Md. 424, 438, 149 A. 4, 149 A. 565; Brown v. Bendix Radio Division, 187 Md. 613, 51 A.2d 292; Gosnell v. Baltimore & Ohio R. Co., 189 Md. 677, 687, 57 A.2d 322; State, for Use of Parr v. Board of County Commissioners, 207 Md. 91, 113 A.2d 397, 402. See also Gordon v. Bedard, 1929, 265 Mass. 408; 164 N.E. 374 and Kenyon v. Hathaway, 1931, 274 Mass. 47, 174 N.E. 463, 73 A.L.R. 156.

It is not necessary in this case to determine whether the mere fact that Chaney permitted O'Brien to drive without a chauffeur's license is sufficient to take the case to the jury against Chaney on this issue, since that fact must be considered in connection with the evidence of O'Brien's drinking.

█ (2) The Court of Appeals of Maryland has adopted and applied the rule formulated in the Restatement, Torts, Sec. 390, that " 'one who supplies directly or through a third person a chattel for the use of another whom the supplier knows or from facts known to him, should know to be likely because of his youth, inexperience or otherwise, to use it in a manner involving unreasonable risk of bodily harm to himself and others whom the supplier should expect to share in, or be in the vicinity of its use, is subject to liability for bodily harm caused thereby to them' ". Rounds v. Phillips, 166 Md. 151, 166, 167, 170 A. 532, 535, and 168 Md. 120, 123, 177 A. 174. The Court also approved the statement under Comment b that the rule is applicable "irrespective of whether the chattel is to be used for the supplier's purposes or for the purpose of him to whom it is supplied", but added: " * * * of course, there are, and must be, limitations upon the application of the rule", 166 Md. 166–167, 170 A. 532. See also Houlihan v. McCall, 197 Md. 130, 138, 78 A.2d 661.

Rounds v. Phillips was a suit against parents who permitted their minor son to use for his own purposes an automobile titled in the name of the mother, with knowledge that the son was habitually reckless and addicted to alcohol. The son had also been in a serious accident two or three years before the fatal accident involved in Rounds v. Phillips. In discussing the contention that knowledge of the accident had not been brought home to the defendants, the Court said, 168 Md. 120, 126, 177 A. 174, 176:

"But admittedly both of the defendants knew of the revocation, in May, 1932, of their son's license to operate an automobile, and with that knowledge they apparently made no effort to exercise their parental right to ascertain and determine whether he could be safely intrusted with a renewal of that privilege. To be wholly indifferent to such a serious problem is hardly consistent with the responsibility involved in a parent's authority. The fact that his license was renewed, after the required insurance was provided, is not a sufficient ground for relieving the defendants of their duty to restrict their son in the use of the automobile to the extent to which such control might be necessary in the interest of his own and the public safety. The revocation of his license because of intoxication when driving an automobile was a fact which would naturally prompt an investigation by the defendants as to the habits of their son affecting his qualifications as the driver of a car. If such a course had been pursued, in the proper directions, the defendants would undoubtedly have learned the additional and regrettable facts, proved in this case, as to their son's recklessness in the operation of his car on the public highways. It is therefore inferable that the defendants, from the facts known to them, should have become apprised of the 'unreasonable risk of bodily harm to himself and others' involved in their son's use of an automobile without restraint."

Rounds v. Phillips is the only case in which Maryland has had to pass on the question of how much knowledge of a driver's recklessness is essential to take a case to the jury. In other States, however, defendants have been held liable for entrusting their motor vehicles to drivers known to become intoxicated. Crowell v. Duncan, 145 Va. 489, 134 S.E. 576, 50 A.L.R. 1425; Chaney v. Duncan, 194 Ark. 1076, 110 S.W.2d 21. Other courts have been less strict in holding the owner liable. For example, Fisher v. Fletcher, 191 Ind. 529, 133 N.E. 834, 22 A.L.R. 1392; Sanders v. Lakes, 270 Ky.

98, 109 S.W.2d 36. In Williamson v. Eclipse Motor Lines, 145 Ohio St. 467, 62 N.E.2d 339, 342, 168 A.L.R. 1356, where a verdict for the plaintiff was reversed because the defendant did not have knowledge of the driver's reckless tendency or drinking propensity or the fact that his Ohio driver's license had been revoked, the court recognized the following rule:

"In the cases involving the entrustment of a motor vehicle to an intoxicated driver, or one whose drinking propensities are known by the owner, it is generally held that the owner assumes the risk of recklessness of such driver, even though the driver was sober when the motor vehicle was placed in his possession, for the reason that the owner is put on notice of what is likely to occur if one addicted to drinking drives a motor vehicle."

■ No quantitative line can be drawn with respect to the amount of knowledge which an owner must have of a driver's propensity for drinking to make the owner negligent in entrusting a motor vehicle to him. All of the circumstances of the case must be considered, including the type of vehicle and the area in which the vehicle is to be operated. In this case, the vehicle was a heavy dump truck, to be driven loaded with sand and gravel. The truck was to be driven in and around the City of Washington, a large metropolitan center, where traffic is exceedingly heavy. Chaney knew that O'Brien drank. He was so worried about O'Brien driving the truck at night and on week-ends after he had been drinking that he revoked permission previously given to O'Brien to keep the truck overnight and over the week-ends. There was evidence from which the jury might find that within three weeks before the accident Chaney had found O'Brien drunk in the truck parked outside a tavern in the afternoon of a working day. This evidence is admittedly not as strong as the evidence in Rounds v. Phillips; but the Court of Appeals in that case approved the broad rule set out in the Restatement, and since 1933 there has been a great increase in both scientific and popular knowledge of the effect of even moderate amounts of alcohol on a driver's reaction time and other elements of driving. The holiday slogan "Let the one for the road be coffee" has won approval even from distillers. The common law is not static but adapts itself to changing conditions and increasing knowledge. Barnes Coal Corp. v. Retail Coal Merchants Association, 4 Cir., 128 F.2d 645, 648; Damasiewicz v. Gorsuch, 197 Md. 417, 440–441, 79 A.2d 550.

■ I conclude that in this case there was evidence legally sufficient to go to the jury on the question whether Chaney was negligent in entrusting his truck to O'Brien on the day of the accident.

B. Was there any evidence legally sufficient to prove that O'Brien was acting as agent or employee of Chaney and in furtherance of Chaney's interests at the time of the accident?

■ There is, of course, a presumption that the driver of a motor vehicle is the agent or servant of the owner, engaged in the course of his employment; but this presumption is only prima facie and may be rebutted and overcome by evidence to the contrary, so that the question becomes one for the court.

The question in this case involves the difference between "deviation" and "departure" in the Maryland law. As early as 1932, Judge Sloan said: "The decisions are in such hopeless confusion that it is useless to attempt a review of them with any idea that they can be reconciled." McDowell, Pyle & Co. v. Magazine Service, 164 Md. 170, 173, 164 A. 148, 149. Nevertheless, a Federal court must make the attempt.

In the early case of Symington v. Sipes, 121 Md. 313, 88 A. 134, 47 L.R.A., N.S., 662, the owner of an automobile was held not liable as a matter of law where the owner had loaned his car and chauffeur to his brother for a trip from Baltimore to Virginia; the chauffeur returned to Baltimore alone, but, upon

reaching the suburbs, engaged in a tour of roadhouses and saloons, picking up companions on the way; and the accident occurred while the chauffeur was returning with his friends about 9 P.M. to the point from which he had started on this excursion.

The leading case in Maryland is Fletcher v. Meredith, 148 Md. 580, 129 A. 795, 45 A.L.R. 474. On the morning of the accident, a truck driver asked the defendant, his employer, to lend him a light truck to go to a funeral. Defendant refused, but said the driver could deliver a load of lumber in his regular truck to a point in the same direction where the funeral was to take place, and then take the rest of the afternoon off and drive to the funeral. The driver did so, taking his sister with him. After the funeral, and while returning to defendant's place of business in Annapolis, the driver hit the plaintiff, who was walking with his bicycle along the road. Recovery was sought on the theory that the driver had finished his own use of the truck and returned to the employer's business by returning toward Annapolis "where the truck was kept"; that delivering the lumber, which was done in the service of the employer, involved as a necessary incident the return to Annapolis, and therefore that the driver had resumed the employer's service when the funeral was over and he was returning home. The Court of Appeals (Bond, C. J.) held, 148 Md. at page 583, 129 A. at page 796:

> " * * * that the bare fact of return toward the garage after a personal use by the employee does not alone constitute resumption of the employer's service; that it may in some circumstances, and in others it may not. It would seem possible that an employer's service could be terminated at a distant point, and the car or truck then delivered over to the use of the employee until ultimately returned to the garage. And we think that is the proper analysis of this case. It may be said upon the testimony here that the whole trip originated as one on personal business of the employee. And when it is added that after the delivery of the lumber at Mason's Beach, the employee and the truck were released from the employer's service for the afternoon, it seems to us clear that the return towards Annapolis cannot be taken as a resumption of that service except by way of a fiction, and that it would involve a break with the law of agency to hold the employer liable for the results of the accident which then occurred. We do not consider ourselves at liberty to make that break."

In McDowell, Pyle & Co. v. Magazine Service, 164 Md. 170, 164 A. 148, a truck driver made his last delivery; decided to go home for lunch, as he was permitted to do; and on the way to his home, which was twenty blocks off the direct route back to his employer's place of business, had an accident. The court held that it was a question for the jury whether he was engaged on his own, on his employer's business, or on both.

In Phipps v. Milligan, 174 Md. 438, 199 A. 498, defendant's auto salesman borrowed defendant's car to drive a customer to Baltimore from Annapolis and thereafter to visit some friends in Baltimore. En route back to Annapolis, he had an accident. Although the facts were obviously similar to Fletcher v. Meredith, the trial judge refused to follow that case in view of intervening decisions. The Court of Appeals reversed and directed a verdict in favor of the defendant, based flatly upon Fletcher v. Meredith.

In National Trucking & Storage v. Durkin, 183 Md. 584, 39 A.2d 687, 689, defendant's driver, Greer, was told in Washington at 7 A.M. to take a trailer to Baltimore, load sugar and return to Washington. After loading, he met another driver at Pier 3, Light Street, who had previously unhitched his tractor. They drove the tractor to lunch ten blocks away, and then both were tattooed. While returning to Pier 3 they became lost, and at the time of the accident were

headed away from the Pier. The Court of Appeals said:

"\* \* \* we think the evidence clearly shows a departure from the master's business when the loads were left at Light Street and the employees took the tractor for the purpose of procuring a meal and other entertainment in Baltimore, in disregard of their instructions to return to Washington. This is not a case of deviation from route, or a case where the employee was serving the purposes of his master as well as his own. It is immaterial whether the use of the tractor was authorized or not, and the bare fact of return toward the point of departure, after a personal use by the employee, does not alone constitute resumption of the employer's service; \* \* \*.

"If the facts show a departure from the master's business, the chain of liability is severed, but if the facts show a mere deviation in the servant's interest, liability still may attach, and the question is one for the jury."

See also the following cases which arose under the Workmen's Compensation law: Greenwald v. Powdermaker, 170 Md. 173, 183 A. 601; Rumple v. The Henry H. Myer Co., Md., 118 A.2d 486.

Defendant argues that in the case at bar there was a departure within the meaning of the Durkin case, and that such departure could not end until O'Brien had returned the truck to the gravel pit. Undoubtedly there was a departure when O'Brien stole the load of gravel at the pit early in the afternoon, drove to Forrestville, sold the gravel, and embarked upon his tour of the taverns. But plaintiff relies on the evidence that O'Brien's only reason for returning to the pit was to turn in the ticket which he should have turned in earlier in the day, and that the truck was going toward the pit, reversing the direction O'Brien had followed in delivering the load in Washington, although he had not quite reached the point on Branch Avenue where he had entered that road on his return to the pit earlier in the day.

It is impossible to be certain whether a Maryland Court would consider this evidence sufficient to distinguish this case from the Durkin case. The Restatement, Agency, sec. 237, states: "A servant who has temporarily departed from the scope of employment does not reenter it until he is again reasonably near the authorized space and time limits and is acting with the intention of serving his master's business." But in view of my decision on the other issue, it is not necessary for me to decide in this case whether the evidence rebuts the presumption so clearly that a verdict should have been directed on this issue.

The motion for judgment n. o. v. must be denied.