## JOSHUA McFADDEN *v.* STATE OF MARYLAND

[No. 1079, September Term, 1978.]

*Decided July 9, 1979.*

The cause was submitted on briefs to MORTON, THOMPSON and MOYLAN, JJ.

Submitted by *David W. Skeen, Assigned Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Paul T. Cuzmanes, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Leslie Stein, Assistant State's Attorney for Baltimore City,* for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Joshua McFadden, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge

Robert L. Karwacki, of rape. Upon this appeal, he raises two contentions:

1) That the judge erred in refusing to ask two questions requested by the appellant on the *voir dire* examination of the jury;

2) That the judge erred in refusing to disqualify himself.

The victim in this case, Lillie Robinson, was a 65 year old woman who was raped at knife-point at approximately 2 PM, on October 22, 1977. A medical examination showed evidence of genital trauma. The appellant took the stand in his own defense and admitted sexual intercourse. He claimed, however, that the act was consensual. Credibility was thus very much in issue.

In full context, that phase of the *voir dire* examination now in issue went as follows:

"The Court: There may be certain testimony in this case from Baltimore City Police Officers or Baltimore City Police Department Police. Would anyone on this jury panel tend to give more or less weight to that testimony than you would from any other citizen? Show a negative response.

As I have already told you, the charge in this case is one of Rape. The complaining witness is a 65 year old female and the Defendant is a 47 year old male. Is there anything about this age difference which would cause any member on this jury panel or any member of this jury panel to give more weight to the testimony of the complaining witness than you would to the testimony of the Defendant? Indicate a negative response.

Is there any member of the jury panel who would be inclined to believe that a female would not say she was raped unless it was true? Indicate a negative response.

Is there any reason about which I have not specifically inquired why any member of this jury

panel feels that you cannot sit with impartiality as a juror in this case and return a verdict solely upon the evidence presented? Show a negative response.

Counsel, any further *voir dire* examination?

Mr. Reddick: One moment, Your Honor.

Mr. Stein: None, Your Honor, on behalf of the State.

(Whereupon, there was a brief pause in the proceedings.)

Mr. Reddick: Your Honor, my number 14 and 15.

The Court: I have not given that and I don't think that's an appropriate *voir dire* examination, but I'll hear from you as to why you believe it is.

Mr. Reddick: Well, number 14, I ask the Court to ask the jury, "If the complainant should cry while she is testifying would you think her testimony is more credible than if she did not cry while testifying?" I think if they were to give an affirmative answer to that and the prosecuting witness does cry, I think it might elicit sympathy. Therefore, sympathy might take over or influence reasoning and the decision, and if they were to answer yes then I would move that they be stricken.

In number 15 I ask the Court to ask the jury, "If the complaining witness should testify she is a missionary or christian lady would you be more likely to believe her than believe the Defendant merely because the Defendant does not claim to be a missionary or a christian man?" If they answer affirmative to that, if the Judge would ask the question, I think it would be grounds for disqualification. Even if the Court did not strike them for cause, then I certainly would then have an opportunity to use my peremptory challenges.

The Court: Okay.

Mr. Reddick: I think they are proper questions.

Mr. Stein: Your Honor, I think they are fishing

expeditions. I don't think they are proper questions, particularly question 14 which I think is totally improper.

The Court: I don't believe that they are intended to really elicit challenges for cause but rather to in fact argue in advance through the vehicle of *voir dire* questions the positions of counsel. I decline to give those two requests. Any other requests, Mr. Reddick?

Mr. Reddick: None.

In Maryland, the extent of *voir dire* examination rests in the sound discretion of the trial judge. *Phenious v. State,* 11 Md. App. 385, 389. In this case, Judge Karwacki thoughtfully and thoroughly explored the jury's pre-disposition to believe or disbelieve. The complaining witness was not a professional religious worker. As a follow-up question to the questions he did ask, question number 15 about believing "a missionary or christian lady" could well have gone either way. In full context, however, we cannot say that Judge Karwacki abused that discretion which is wisely vested in him.

We are not unmindful of *Casey v. Roman Catholic Archbishop,* 217 Md. 595, or *Langley v. State,* 281 Md. 337, urged upon us by the appellant, but find them readily distinguishable. Unlike the present case, which dealt not with a professional religious worker but only with the vague characterization of the witness as "a missionary or christian lady," *Casey v. Roman Catholic Archbishop, supra,* was replete with stark denominational loyalties. The defendant, albeit in his corporate capacity, was the Roman Catholic Archbishop for the Archdiocese of Baltimore. The plaintiff, also a member of the faith, had slipped on a waxed floor inside the church itself as she made her way from the confessional booth to the altar to complete her prayers. There was genuine concern over whether a juror who was a staunch Roman Catholic could return a verdict against his church or his Archbishop. The *voir dire* questions which were not asked and were there in issue were:

"(1) Does any member of the jury panel have any preconceived objections to, or any preconceived

opinions in favor of, or any bias or prejudice in favor of or against, a suit in which Roman Catholic Archbishop of Baltimore, a corporation sole of the State of Maryland, is sought to be held liable in damages for injuries claimed to have resulted to a person, a member of the Parish of the Roman Catholic Church in which such person claims to have been injured, that would prevent you from fairly and impartially deciding such a case?"

"(2) If, in your opinion, the evidence in the case warrants a verdict for the plaintiff, Miss Casey, against Roman Catholic Archbishop of Baltimore, a corporation sole of the State of Maryland, the defendant, is there any member of the jury panel who could not fairly and impartially assess damages in the case in the same manner as if the defendant were a regular corporation or a natural person?"

The Court of Appeals made it very clear that a mere generalized question about a "religious corporation" would not survive to ferret out a strong denominational loyalty that might render a juror incapable of returning an unbiased verdict. It said at 217 Md. 606-607:

"To ask the jurors whether they would be prevented from rendering a fair and impartial verdict by the fact that a party was a 'religious corporation' — which they might not even realize meant a church — without informing them of the church involved or the position of the religious corporation in the suit would defeat the whole purpose of questioning jurors on their *voir dire*. We think there is no doubt that the court should have informed the prospective jurors that the action was a suit by Harriet M. Casey against Roman Catholic Archbishop of Baltimore, a corporation sole, for personal injuries allegedly arising out of an accident which occurred in St. Patrick's Church at Havre de Grace on October 2, 1954; that the suit was against the corporation only, as the holder of the legal title to the church building;

and that it was not a suit against the Archbishop of Baltimore personally nor against him in his ecclesiastical capacity as such Archbishop. Then, the court should have propounded a question inquiring if there was any reason why any juror could not arrive at a fair and impartial verdict based on the evidence to be produced and the law applicable to the case to be set forth in the instructions of the court, or words to that effect. If the court had deemed it necessary, it could have continued to examine the jurors, or any one of them, in the manner suggested in *Bryant v. State, supra.* By so doing, the nature of the answer, if it disclosed cause for disqualification, would not necessarily have revealed the religious affiliation of the juror who made answer, and whether the juror was favorably or unfavorably disposed toward the Roman Catholic Church or toward an adherent to its religious faith."

Its holding was very clear that what was involved was the possible "existence of bias or prejudice" resulting directly from "the religious affiliation of a juror," the Court saying at 607:

"[T]he law is clear that, if the religious affiliation of a juror might reasonably prevent him from arriving at a fair and impartial verdict in a particular case because of the nature of the case, the parties are entitled to ferret out, or preferably have the court discover for them, the existence of bias or prejudice resulting from such affiliation."

*Casey* reiterated the established law of Maryland that "the scope of the questions propounded to jurors on their *voir dire* is largely in the discretion of the trial court" and that "the only purpose of the inquiry is to ascertain the existence of cause for disqualification." p. 605. Involved in this case was the speculative possibility that a juror might believe "a christian lady" more than an ordinary witness. Involved in *Casey* was nothing less than the ability of "the faithful" to return a verdict against the Mother Church. In this case, we

are probing at most a possible factor in evaluating the credibility of a witness; in that case, the probing was for a strong institutional bias for or against a very party to the lawsuit. Indeed, the authorities cited by *Casey* highlight the strong and immediate impact of direct and unambiguous bias:

> "And see *Miles v. United States,* 103 U. S. 304 (1881), [jurors asked if they believed in the truth of Mormon teachings]; *People v. Reyes,* 5 Cal. 347 (1855), [conviction of Mexican Roman Catholic reversed because trial court refused to inquire if prospective jurors were members of the Know Nothing Party and had taken a secret obligation under which they could not possibly have given a Roman Catholic a fair and impartial trial]; *Smith v. Smith,* 7 Cal.App.2d 271, 46 P. 2d 232 (1935), [jurors asked if their religious belief in regard to divorce and remarriage might affect the verdict]." p. 607.

Nor do we find the case of *Langley v. State, supra,* to be dispositive of the issue now before us. In *Langley,* to be sure, what was involved was the impact of bias on the credibility of a witness and not the impact of a bias for or against a party to the suit. To this extent, *Langley* is closer to our present problem than is *Casey.* Notwithstanding this similarity, we find the difference between the *Langley* situation and the one before us to be critical. A key witness for the State in the *Langley* case was a Prince George's County policeman. The prospective *voir dire* question, requested but refused, was:

> "Is there anyone here who would give more credit to the testimony of a police officer over that of a civilian, merely because of his status as a police officer?"

The exhaustive analysis of Judge Smith for the Court of Appeals, as well as the cases relied upon in that analysis, makes it clear that the special, official, governmental status of a policeman is the quality that has to be probed. *Langley* and the cases it relies upon are dealing not with individual human attributes that make one witness more believable (or

less believable) than another but with the special status of being an official agent of government and with the aura which that status generates. Looming large in the Court of Appeals' analysis were two cases from the United States Court of Appeals for the District of Columbia — *Sellers v. United States,* 271 F. 2d 475 (1959), and *Brown v. United States,* 338 F. 2d 543 (1964). In the *Brown* case, Judge Burger (now Chief Justice of the United States) summarized the holding of *Sellers* as he moved toward a similar holding in *Brown,* saying at 338 F. 2d 545:

> "We construe that case as establishing that when important testimony is anticipated from certain categories of *witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony,* a query as to whether a juror would have such an inclination is not only appropriate but should be given if requested. Failure to make appropriate inquiry, when requested, does not necessarily require reversal; the issue turns on the degree of impact which the testimony in question would be likely to have had on the jury and what part such testimony played in the case as a whole." (Emphasis supplied)

The Court of Appeals in *Langley* also looked approvingly to the Pennsylvania decision of *Commonwealth v. Futch,* 469 Pa. 422, 366 A. 2d 246 (1976). *Futch* was dealing with prison guards rather than policemen but the principle it articulated was the same. The Supreme Court of Pennsylvania there said, at 366 A. 2d 249-50:

> "The rationale underlying *Brown v. United States, supra,* is that although it is likely that jurors might believe testimony of law enforcement officials solely by virtue of the group's official status, it is unreasonable for them to do so because *official status is no guarantee of trustworthiness."* (Emphasis supplied)

After a thorough analysis of the case law from other jurisdictions in this regard, *Langley* articulated its own conclusion, at 281 Md. 348:

> "A juror who states on voir dire that he would give more credit to the testimony of police officers than to other persons has prejudged an issue of credibility in the case. Regardless of his efforts to be impartial, a part of his method for resolving controverted issues will be to give greater weight to the version of the prosecution, *largely because of the official status of the witness. The argument by the State that police officers are entitled to greater credibility because they have less interest in the outcome of the case is not sufficient to overcome such an objection.*"
> (Emphasis supplied)

Notwithstanding the two very special and very extreme situations dealt with in *Casey* and in *Langley,* the general rule remains (and, as a practical matter, almost has to remain) that the matter should be entrusted to the sound discretion of the trial judge. *Langley* itself well expressed this point, at 281 Md. 337:

> "This Court has observed on a number of occasions that there is no statute in Maryland prescribing the objects of inquiry in determining the eligibility of jurors, and the subject is not covered by rigid rules, but is committed largely to the sound discretion of the trial court in each case."

*Langley* itself looked approvingly to the words of Judge Hammond in this regard in *McGee v. State,* 219 Md. 53, 58-59, 146 A. 2d 194 (1959):

> "It is settled in Maryland that in examination of jurors on their *voir dire,* the court may frame its own questions and not permit cross-examination by counsel, that the extent of the examination rests in the sound discretion of the court, and that the purpose of the inquiry is to ascertain 'the existence of cause for disqualification and for no other

purpose.' . . . Questions not directed to a specific ground for disqualification but which are speculative, inquisitorial, catechising or 'fishing', asked in aid of deciding on peremptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them."

Measured against that general standard, we can find no clear abuse of discretion by Judge Karwacki in the case now before us. With respect to the prosecuting witness in question, there was not involved any occupational or even official denominational status, but only a general attribute of character. Judge Karwacki did probe the jury specifically as to whether the age difference between a 65-year-old female and a 47-year-old male would "cause any member on this jury panel ... to give more weight to the testimony of the complaining witness than you would give to the testimony of the defendant?" He probed further as to whether any member of the panel "would be inclined to believe that a female would not say she was raped unless it was true?" After a significant exploration of the jury's possible attitude toward this rape victim, Judge Karwacki declined to carry it further, offering the opinion that the further questions were not "intended to really elicit challenges for cause but rather to in fact argue in advance through the vehicle of *voir dire* questions, the positions of counsel." We do not believe a *per se* rule is called for under the circumstances of this case. Absent such a *per se* rule, we cannot say that there was an abuse of discretion here.

The appellant's second contention is that Judge Karwacki committed error when he refused to disqualify himself. There had been an earlier mistrial (because of a hung jury) over which Judge Karwacki had presided. Pointing out that the present trial was to be a jury trial and not a court trial, Judge Karwacki declined to disqualify himself. He was absolutely correct in so doing. He was not the fact finder and was not, therefore, in a position to be influenced by any testimony which he had heard on an earlier occasion. His rulings of law, moreover, are fully subject to appropriate appellate review.

The contention is utterly devoid of merit. *Laws and Doorman v. State,* 7 Md. App. 84, 87.

*Judgment affirmed; costs to be paid by appellant.*