550 A.2d 722

**Andre WILLIAMS**

v.

**STATE of Maryland.**

**No. 535, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Dec. 5, 1988.

412

George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender and Daniel Shemer, Asst. Public Defender, on the brief), Baltimore, for appellant.

Gary E. Bair, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and WILNER and POLLITT, JJ.

GILBERT, Chief Judge.

Two outstanding authorities on the common law, Sir Edward Coke and Sir Matthew Hale[1] disagree as to wheth-

---

1. Coke was appointed Lord Chief Justice of the King's Bench by King James I in 1613. He was renowned for advancing the argument that the common law was the supreme law of England. Hale was appointed by Oliver Cromwell in 1671 as Lord Chief Justice of the King's Bench. The fact that Hale's appointment occurred during the Cromwell era may in some manner account for the philosophical differ-

er a child born alive but who dies as a result of an injury sustained *in utero* is a homicide victim. In this case we are called upon to decide which of those distinguished legal scholars Maryland should follow. Our course shall determine whether Andre Williams is guilty of manslaughter of a newborn infant or not guilty of any offense insofar as the infant is concerned.

Before beginning our discussion of the law, we shall briefly recount the eldritch facts of the matter.

### The Facts

As he returned home from his place of employment, Williams encountered Lamont Jones who wanted Williams to engage with him in fisticuffs. Jones was angry because Williams refused to surrender a photograph which allegedly depicted Williams engaged in a sexual activity with Jones's girlfriend. In an attempt to gain possession of the photograph, Jones took Williams's wallet and ran. Williams then entered his home and called the police. Shortly thereafter, an intermediary, an acquaintance of both Jones and Williams, endeavored to return the wallet to Williams, but the latter refused to accept it.

When Williams went out of his home, he saw Jones approaching, carrying a lead pipe. Jones swung three times at Williams with the pipe. Williams retreated into his house. When he reemerged, he was armed with a bow and arrow. He drew the arrow as he ran to the street corner. Williams testified that he had "cooled-off"; but when he maladroitly attempted to release the tension on the drawn arrow, it discharged and penetrated the body of a passerby, Jewel Lyles.

The police arrived to find Ms. Lyles lying on the ground, bleeding profusely. Williams, who remained at the scene, told police that he had shot her with the arrow.

---

ences in the views of Coke and Hale. In any event, that is an issue we need not and do not decide.

Lyles was nine months pregnant at the time of the incident. She was rushed to the emergency room of Johns Hopkins Hospital where it was determined that the arrow lacerated her *vena cava.* Resuscitative efforts proved unsuccessful, and the baby was delivered by caesarean section. Ms. Lyles died from the massive loss of blood she sustained as a result of the wounding. The baby survived her for seventeen hours, but it too expired from the injury it received *in utero*, the result, we think, of "the . . . arrows of outrageous [mis]fortune." [2] The infant's death was due to a lack of oxygen to the fetus which in turn was caused by the mother's massive loss of blood.[3]

Andre Williams was convicted by a jury in the Circuit Court for Baltimore City (Bothe, J.) of two counts of manslaughter and one count of carrying a weapon openly with intent to injure. He was sentenced to consecutive terms totaling twenty-three years imprisonment.

Williams raises a pentad of issues for our review, namely:

I. May appellant be convicted of manslaughter of an infant born alive but who because of appellant's actions sustained a fatal injury *in utero*?

II. Did the trial court err in refusing to propound certain proposed *voir dire* questions?

III. Did the trial court err in refusing to grant defendant's instruction concerning the deadly weapons offense?

IV. Was the jury improperly instructed with respect to the defenses of accident and abandonment of criminal intent?

V. Were the sentences based on improper considerations?

---

2. W. Shakespeare, *Hamlet,* Act III, Scene i, L. 56.

3. Insofar as we have been able to determine, Ms. Lyles and her infant son are the first two deaths from a bow and arrow killing in the recorded history of this State's appellate courts.

**416**

*The Law*

The Maryland Constitution, Declaration of Rights, Article V, provides:

"That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore."

The Court of Appeals in 1821 declared: "Whether particular parts of the common law are applicable to our local circumstances and situation, and our general code of laws and jurisprudence, is a question that comes within the province of the Courts of justice, and is to be decided by them." *State v. Buchanan,* 5 H. & J. 317, 365–66 (1821). Decisions by the Courts of England subsequent to July 4, 1776, are not part of the common law of Maryland. *Id.*

It is beyond question that in this State manslaughter is a common law felony. *Connor v. State,* 225 Md. 543, 171 A.2d 699 (1961); *State v. Gibson,* 4 Md.App. 236, 242 A.2d 575 (1968). The crime is not defined by statute. All that Md.Ann.Code art. 27, § 387 (Manslaughter) does is prescribe the penalty for the crime. Gilbert & Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.7.

## I.

■ Having established that the common law applies to the incident, we are then left with the question of whose version of the common law—Coke's or Hale's—is applicable to the infant's death. Did Williams commit the felony of manslaughter, or is what he did a regrettable but non-punishable incident?

Williams asserts that, under the common law of England, as applicable in Maryland, pursuant to Article V of the Declaration of Rights, no homicide is committed whenever an infant who is born alive dies as a result of injuries sustained *in utero.* To bolster his argument, he quotes from Lord Hale, who declared the common law of England to be:

> "If a woman be quick or great with child, if she take or another give her any potion to make an abortion, or if a man strike her, whereby the child within her is killed, it is not murder nor manslaughter by the law of England, because it is not yet in rerum natura, tho it be a great crime, and by the judicial law of Moses was punishable by death, nor can it legally be made known whether it were killed or not, so it is, if after such child were born alive, and baptized, and after die of the stroke given to the mother, this is not homicide."

1 Hale, *Pleas of the Crown* 433 (1736).

As further support for his position, Williams cites *Rex v. Pulley,* 5 Car. & P. 539 (1833). That case involved a defendant charged with the murder, during the birthing process, of her illegitimate infant. The defendant was adjudged not guilty. A reading of the case makes clear that the court concluded the infant was not born alive but had died during childbirth.

Appellant has also referred to the criticism in *Roe v. Wade,* 410 U.S. 113, 134–36, 93 S.Ct. 705, 717–19, 35 L.Ed.2d 147 (1973), of Lord Coke's position. Without venturing into the relative merits of *Roe,* we observe that the discussion by the Court concerning Coke's views was limited to consid-

eration of voluntary abortion after quickening. It did not address the matter now before us. *Roe* is, in a word, inapposite.

Lord Coke's interpretation of the common law is diametrically opposite to that of Hale. In his *Institutes* Coke wrote that, under the common law of England:

"If a woman be quick with childe, and by a potion or otherwise *killeth it in her wombe;* or if a man beat her, whereby the *childe dieth in her body,* and she is delivered of a *dead childe,* this is a great misprison, and no murder; but if the childe be *born alive* and dieth of the potion, battery, or other cause, this is murder: for in law it is accounted a reasonable creature *in rerum natura,* when it is born alive ... and so was the law holden in Bracton's time...."

3 Coke, *Institutes* *50 (1648) (emphasis supplied).

To undercut Coke's position and simultaneously strengthen that of Hale, appellant refers us to Sir James Stephens's writings on the history of the common law. In an animadversion of Lord Coke, Sir James penned, "A more disorderly mind than Coke's and one less gifted with the power of analyzing common words it would be impossible to find." Stephens, 2 *A History of the Criminal Law of England* 211 (1883). We think the quotation from Stephens's work is carved less in stone than in ice, and we shall proceed to melt it with the warm breath of judicial ratiocination.

Sir William Blackstone, one of the foremost legal authorities on the common law, repeated Coke's quotation in the *Commentaries.* 1 Blackstone, *Commentaries* 129–130 (1765). Furthermore, the passage in Coke is cited as authority for the court's decision in *Rex v. Senior,* 1 Moody C.C. 346 (1832). There, the defendant "broke and compressed" the skull of a fetus during childbirth. The injury occurred while the fetus was *"in ventre sa mere,"* or prior to its being born alive. The baby was born alive but died of the injury sustained while in the birth canal. The defendant was convicted of manslaughter.

Another eminent writer, William Hawkins, serjeant at law, said in the "Author's Preface" to his *Pleas of the Crown:*

"The treatise published under the name of Sir Matthew Hale, is indeed very useful, and written in a clear method, and with great learning and judgment; but it is certainly very imperfect in the whole, and seems to be only a model or plan of a work of this kind, which is said to have been intended by him."

Hawkins iterates Coke's view of the common law and states:

"And it was anciently holden, that the causing of an abortion, by giving a potion to, or striking a woman big with child, was murder. But at this day it is said to be a great misprison only, and not murder, *unless the child be born alive and die thereof, in which case it seems clearly to be murder,* notwithstanding some opinions to the contrary. And in this respect also, the common law seems to be agreeable to the Mosaical, which as to this purpose is thus expressed: 'If men strive and hurt a woman with child, so that her fruit depart from her, and yet no mischief follow, he shall be surely punished, according as the woman's husband will lay upon him, and he shall pay as the judges determine; and if any mischief follow, then thou shalt give life for life' [Exodus, XXI v. 22, 23]."

1 Hawkins, *Pleas of the Crown* § 16 (1824) (emphasis supplied).

Although it does not appear that a Maryland appellate court has previously considered the issue presented by this case, a number of other American courts have relied upon Coke's interpretation of the common law that a homicide is committed when a child born alive dies of injuries sustained *in utero. Clarke v. State,* 117 Ala. 1, 23 So. 671 (1898); *Keeler v. Superior Court of Amador County,* 2 Cal.3d 619, 87 Cal.Rptr. 481, 470 P.2d 617 (1970); *People v. Greer,* 79 Ill.2d 103, 37 Ill.Dec. 313, 402 N.E.2d 203 (1980); *State v. Anderson,* 135 N.J.Super. 423, 343 A.2d 505 (1975). Two

States have held that a viable fetus is a person within the meaning of their vehicular homicide statutes. *Commonwealth v. Cass,* 392 Mass. 799, 467 N.E.2d 1324 (1984); *State v. Amaro,* 448 A.2d 1257 (R.I.1982). Georgia and Kentucky have followed the "born alive rule" while ignoring the Coke–Hale dispute. *Ranger v. State,* 249 Ga. 315, 290 S.E.2d 63 (1982); *Montgomery v. State,* 202 Ga. 678, 44 S.E.2d 242 (1947); *Jackson v. Commonwealth,* 265 Ky. 295, 96 S.W.2d 1014 (1936). Coke is also followed in 1 *Warren on Homicide* § 71 (1914) and 2 *Wharton's Criminal Law* § 114 (1979).

Maryland, as we have said, has not heretofore addressed the precise issue now before us, but the Court of Appeals has recognized a cause of action in negligence for injuries suffered *in utero* by a viable fetus if it is born alive, *Damasiewicz v. Gorsuch,* 197 Md. 417, 79 A.2d 550 (1951), or if the child is delivered stillborn. *State, Use of Odham v. Sherman,* 234 Md. 179, 198 A.2d 71 (1964). Furthermore, the Court has sanctioned a cause of action for wrongful death of a nonviable fetus born alive. *Group Health Ass'n v. Blumenthal,* 295 Md. 104, 453 A.2d 1198 (1983).

In the light of Coke, Hawkins, Blackstone, and the American commentators Warren and Wharton, together with the decision of the courts of our sister states, it is clear that the English common law recognized the "born alive rule," Hale and Stevens notwithstanding.

We, therefore, hold that the common law of Maryland is when a child is born alive but subsequently dies as a result of injury sustained *in utero* the death of the child is homicide. It follows that the person who caused the injury to the fetus is chargeable with homicide, and Judge Bothe correctly submitted the case to the jury.

We make clear that we are not to be understood as holding that whenever a child is born alive and dies as a result of injuries sustained *in utero* the death is manslaughter as distinguished from another form of homicide. The degree of homicide is a question of *mens rea,* hence, a matter for the fact finder.

## II.

Williams next complains that the trial judge improperly refused to propound three questions during the *voir dire* examination. Williams had requested the court to ask the jurors:

"24. Does any member of this jury panel belong to any political, social, or other group which [h]as adopted a position on the propriety of abortion or the status of a fetus as a human being?

25. Does any member of this jury panel believe that an unborn fetus is a human being, for all intents and purposes?

26. Does any member of this jury panel hold any beliefs about when life begins and is entitled to legal protection?"

This Court in *McFadden v. State*, 42 Md.App. 720, 402 A.2d 1310 (1979), quoting *McGee v. State*, 219 Md. 53, 58–59, 146 A.2d 194 (1959), reiterated the principle that interrogation of jurors in *voir dire* is vested in the sound discretion of the trial judge. The purpose of *voir dire* is to ascertain whether there is a valid cause for disqualification of the prospective juror. *McFadden*, 42 Md.App. at 728, 402 A.2d 1310. Thus, "[q]uestions not directed to a specific ground for disqualification but which are speculative, inquisitional, catechising or 'fishing,' asked in aid of deciding preemptory challenges, may be refused in the discretion of the court, even though it would not have been error to have asked them." *McGee*, 219 Md. at 58–59, 146 A.2d 194.

Judge Bothe refused to ask the quoted *voir dire* questions Williams proposed because she viewed them as irrelevant to the issue of the homicide of an infant who was born alive. We perceive no abuse of discretion in the judge's ruling. Each of the proposed questions was directed toward the status of a fetus and the beginning of human life. The jurors were not called upon to address those issues in determining appellant's culpability.

### III.

■ Williams was further charged with the crime of carrying a dangerous weapon openly with the intent to injure another person. Md.Ann.Code art. 27, § 36(a). He avers that Judge Bothe erred in refusing to instruct the jury regarding the self-defense exception to a deadly weapons charge. The self-defense exception to the crime is embodied in Md.Ann. Code art. 27, § 36(d), which provides, in pertinent part:

"Nothing in this section shall be construed to prevent the carrying of any of the weapons ... by ... any person as a reasonable precaution against apprehended danger, but the ... [Court] shall ... judge the reasonableness of the carrying of any ... weapon ... under the evidence in the case."

Williams's testimony established that he entered his house, obtained the bow and arrow, and then ventured forth to look for Jones, who had fled. Judge Bothe instructed the jury:

"In order to convict the defendant, the State must prove beyond a reasonable doubt:

(1) that the defendant wore or carried a dangerous weapon;

(2) that it was carried openly with the intent to injure another person; and

(3) that the defendant was not reasonably apprehensive of being attacked."

That instruction directed the jurors' attention to the concern raised by the defense. It compelled the jurors to consider whether Williams was reasonably apprehensive of being attacked at the point in time when he carried the bow and arrow out of his house and, with the bow fully drawn, went to look for Jones. The instruction adequately covered the applicable law. Furthermore, we think that under the attendant circumstances it is unreasonable to characterize Williams's behavior as a precaution against apprehended danger.

## IV.

■ Penultimately, Williams argues that the trial court placed an improper burden of proof upon him when it instructed the jury:

"If you find from the evidence that the ... discharge of the arrow was purely an accident and not brought about by any intention of the defendant to harm anyone, and not done in wanton disregard of the lives of others, then in the event you find that the act was purely an accident, the defendant would not be guilty of any crime of homicide.

You must examine all of the evidence to determine the circumstances under which you find the arrow was discharged from the bow while in the hands of the defendant, keeping in mind that the State has the burden of proving the defendant's guilt to any crime or degree thereof."

■ Williams had requested that the court instruct the jury that accidental killing is a defense to a prosecution for homicide, and that the accused does not carry the burden of proving that the killing was an accident.

Judge Bothe's instruction to the jury fairly and accurately advised them of the applicable law as requested by Williams. Jury instructions need not be given in the precise language requested by counsel so long as the points of law contained in counsel's proposed instruction are embodied in the instruction given to the jury. *King v. State,* 36 Md. App. 124, 136, 373 A.2d 292, *cert. denied,* 281 Md. 740 (1977). Moreover, the instruction in the instant case specifically informed the jury that the burden of proving the crime remained on the State. There is nothing in the instruction that suggests that appellant's defense of accident in any manner shifted to him the burden of proving that the slaying was accidental.

■ A claim is made by Williams that the trial judge erred when she refused to instruct the jury that abandonment of dolose is a defense to a prosecution for homicide. Judge Bothe reasoned that whether Williams intended to

commit the crime was a factual matter for the jury. Intent at the time of the commission of the crime was an element of each offense, and the State was required to prove that element, as the jury was so instructed. There was no error in the trial court's instructions regarding either the question of accident or abandonment of criminal intent.

## V.

■ Williams, in the case *sub judice*, received the maximum sentences allowed. He challenges the sentences by asserting that he was improperly sentenced for alleged crimes for which he had never been convicted. He argues that the trial judge imposed the maximum sentences because she believed he was guilty of first degree murder. There is nothing in the record to support Williams's hypothesis.

The appellant had a prior criminal record which included two robbery convictions. Patently, the court, in imposing the sentences, considered the "priors," together with the safety of the community, as well as the value of deterrence. We perceive no abuse of discretion in the trial judge's imposition of sentence.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.