905 A.2d 306

Regina KILMON

v.

STATE of Maryland.

Kelly Lynn Cruz

v.

State of Maryland.

No. 91, Sept. Term, 2005.

Court of Appeals of Maryland.

Aug. 3, 2006.

Nancy S. Forster, Public Defender (Laurel Albin, Asst. Public Defender, on brief), for appellant.

Beth S. Brinkman (Doane Kiechel, Christopher Cobb, Morrison & Foerster, LLP, Washington, DC), Lila Bateman, Morrison & Foerster LLP, Denver, CO, Dvid Rocah, Deborah Jeon, American Civil Liberties Union of Maryland Foundation of Baltimore, on brief), for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Roscoe Jones, Jr., Suzanne Sangree, Public Justice Center, Baltimore, Lynn M. Paltrow, National Advocates for Pregnant Women, New York City, amici curiae.

L. Bracy Brown, Women's Law Center of Maryland, Inc., Towson, Judy Waxman, National Women's Law Center, Washington, DC, amici curiae.

Karen Smith Thiel, Patton Boggs, LLP, Washington, DC, amici curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Maryland Code, § 3–204(a)(1) of the Criminal Law Article (CL) makes it a misdemeanor for a person recklessly to engage in conduct that creates a substantial risk of death or serious physical injury to another person. The question before us is whether the intentional ingestion of cocaine by a pregnant woman can form the basis for a conviction under that statute of the reckless endangerment of the later-born child. The answer is "no."

## BACKGROUND

We deal here with two prosecutions in the Circuit Court for Talbot County. In August, 2004, the State's Attorney filed a criminal information charging Regina Kilmon with second degree child abuse, contributing to conditions that render a child delinquent, reckless endangerment, and possession of a controlled dangerous substance. All four charges were based on evidence that Ms. Kilmon had ingested cocaine while pregnant with her child, Andrew Kilmon. The reckless endangerment count charged that Ms. Kilmon, "on or about the 3rd day of June through the 4th day of June, 2004, in Talbot County, Maryland, did recklessly engage in conduct, to wit: using cocaine while pregnant with Andrew Kilmon that created a substantial risk of death and serious physical harm to Andrew Kilmon."

In January, 2005, Ms. Kilmon entered a plea of guilty on the reckless endangerment count in exchange for the State's commitment to *nol pros* the other charges. At the hearing on the plea agreement, the State's Attorney offered, in pertinent part, the following statement of facts in support of the guilty plea:

"On June the 3rd, 2004, the Defendant . . . gave birth at the Easton Memorial Hospital to a baby boy subsequently named Andrew W. Kilmon. At the time of the birth the baby weighed 5.5 pounds. The baby was tested through a drug screen which at the hospital which showed the presence of cocaine at the level of 675 nanograms per milliliter

... [T]he minimum sensitivity level for cocaine is 300 nanograms per milliliter. The State would have produced expert testimony that the result of using cocaine by a pregnant woman ... is as follows: that they are more likely to experience premature separation of the placenta, spontaneous abortion and premature delivery. That cocaine may cause blood clots to develop in the brain of the fetus. May also interfere with the development of the fetus. And that low birth weight in bab[ies] born with cocaine in their system may lead to many health problems versus normal size babies. There would be further testimony that the only source of cocaine in the baby's system would have been that as derived from the blood stream of the mother prior to birth.... These events occurred in Talbot County."

Upon that statement, and after assuring itself that the plea of guilty was knowing and voluntary, the court accepted the plea, found Ms. Kilmon guilty of reckless endangerment, and sentenced her to four years in prison. Ms. Kilmon filed an application for leave to appeal, which the Court of Special Appeals granted. Before any significant proceedings commenced in that court, however, we granted *certiorari.*

In April, 2005, the State's Attorney filed a similar criminal information charging that "Kelly Lynn Cruz, on or about the 13th day of January, 2005, in Talbot County, Maryland, did recklessly engage in conduct, to wit: using cocaine while pregnant with Denadre Michael Thomas Cross that created a substantial risk of death and serious physical injury to Denadre Michael Thomas Cross...." As in Kilmon's case, the State also charged second degree child abuse, contributing to conditions that render a child delinquent, and possession of a controlled dangerous substance but later entered a *nol pros* to those charges. Cruz pled not guilty to the reckless endangerment charge but consented to proceed on an agreed statement of facts, which, in pertinent part, was as follows:

"On January 13th, 2005, the Defendant ... was admitted to the Easton Memorial Hospital ... which is located in Easton, Talbot County, Maryland. She was complaining of stomach pains. She then delivered a 3 pound 2 ounce baby

boy.  According to hospital records she was approximately 29 weeks pregnant at the time. . . . Toxicology screening test was administered to the baby who tested positive for cocaine.  The baby was then transported to Mercy Hospital in Baltimore which confirmed the toxicology results.  Subsequently and while still at Easton Memorial Ms. Cruz was likewise tested for cocaine.  She too tested positive . . . Ms. Cruz denied that she used cocaine and indicated that she had recently been around people who had used cocaine, which is why she believed she would have tested positive. All these events took place in Talbot County."

The court denied Cruz's motion to dismiss for lack of sufficient evidence, stating that "while the instrumentality of the risk of serious bodily injury to the baby may well have been launched prior to the birth of the child, the person suffering the risk of serious bodily injury was the infant child after its birth."  It found her guilty and imposed a sentence of five years in prison, with two-and-a-half years suspended in favor of five years of supervised probation and drug treatment commencing on release from prison.  Ms. Cruz appealed and, as in Kilmon's case, we granted *certiorari* prior to any proceedings in the Court of Special Appeals, to consider the common issue of whether ingesting cocaine while pregnant constitutes a violation of CL § 3–204(a)(1).

## DISCUSSION

We pointed out in *Holbrook v. State*, 364 Md. 354, 365, 772 A.2d 1240, 1246 (2001), that "[r]eckless endangerment is purely a statutory crime" in Maryland.  It exists and is defined solely by CL § 3–204.  Because the issue is therefore entirely one of statutory construction, it is necessary to determine whether, in enacting § 3–204(a)(1) and its relevant antecedents, the General Assembly intended that the statute include the conduct charged.  As we most recently confirmed in *Mackey v. Compass*, 391 Md. 117, 141, 892 A.2d 479, 493 (2006), "[i]f the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as written. . . . If, however, the

statutory text reveals ambiguity, 'then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all of the resources and tools of statutory construction at our disposal.' " *Id.,* quoting, in part, from *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003).

The relevant part of CL § 3–204, subsection (a)(1), makes it a misdemeanor for a person recklessly to "engage in conduct that creates a substantial risk of death or serious physical injury to another." By "another," it obviously meant another person.[1] Aware of the Constitutional issues that may arise from regarding a fetus or embryo as a person, the State, in its briefs, makes clear its position that, for purposes of the convictions under § 3–204(a)(1), the "person" allegedly endangered by each appellant's conduct was not the fetus, but the child, after the child's live birth. The offense, in this context, according to the State, is that the prenatal ingestion of cocaine recklessly endangers the child immediately upon and after his or her live birth.[2]

---

1. CL § 3–204 was enacted as part of the code revision rewriting of the entire criminal code. *See* 2002 Md. Laws, ch. 26. It replaced what was formerly Article 27, § 12A-2, subsection (a)(1), which spoke of a substantial risk of death or serious physical injury "to another person." It is clear that no substantive change was intended by deletion of the noun "person" in ch. 26. Not only is there no indication of any such intent in the Revisor's Note to § 3–204, but § 13 of ch. 26 expressly states that "it is the intention of the General Assembly that, except as expressly provided in this Act, this Act shall be construed as a nonsubstantive revision, and may not be otherwise construed to render any substantive change in the criminal law of the State."

2. In *Kilmon,* the State urges that "[t]he clear legislative intent of the reckless endangerment statute encompasses Kilmon's conduct of using cocaine while pregnant and thereby endangering her newborn son, Andrew." State's Brief at 8. Except for the names, that statement is repeated in the brief filed in *Cruz.* State's Brief at 8. We need not rule here on the anomaly of that position. It would seem, however, that, although the ingestion of cocaine by a pregnant woman may well lead to some injury to the fetus she is carrying, once the child is born and the umbilical cord is cut and expelled, she is no longer pregnant and no amount of cocaine that she then ingests or has previously ingested will get into the bloodstream of the newborn child merely by virtue of her ingestion of it. In attempting to distinguish between the fetus prior to birth and the child after birth for purposes of personhood and treat the

The reckless endangerment statute was first enacted in Maryland in 1989 as Art. 27, § 120. *See* 1989 Md. Laws, ch. 469. As we have pointed out on a number of occasions, it was modeled after § 211.2 of the Model Penal Code, first proposed by the American Law Institute in 1962. *See Holbrook v. State, supra,* 364 Md. at 365, 772 A.2d at 1246. The later-published Commentary to § 211.2 notes that specific kinds of reckless conduct had previously been made criminal in various States—everything from reckless driving to shooting at an airplane to placing an obstruction on railway tracks—and that § 211.2 was intended to "replace the haphazard coverage of prior law with one comprehensive provision" that "reaches any kind of conduct that 'places or may place another person in danger of death or serious bodily injury.'" MODEL PENAL CODE AND COMMENTARIES, PART II (1980) at 195–96.

We have tended to construe the Maryland statute in that manner as well. In *Minor v. State,* 326 Md. 436, 443, 605 A.2d 138, 141 (1992), we held that guilt under the statute does not depend on whether the defendant actually intended that his reckless conduct create a substantial risk of death or serious injury, but whether his conduct, viewed objectively, "was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create the substantial risk that the statute was designed to punish." In *State v. Pagotto,* 361 Md. 528, 549, 762 A.2d 97, 108 (2000), we confirmed the further point made in *Minor* that the statute was "aimed at deterring the commission of potentially harmful conduct before an injury or death occurs."

Unquestionably, the proscription against recklessly endangering conduct is, and was intended to be, a broad one. Whether it was intended to include conduct of a pregnant woman that might endanger in some way the child she is carrying is not so clear, however, as that brings into play some

after-born child as the person endangered, the State creates an arguable impediment to its ability ever to prove the necessary elements of the offense.

important policy-laden considerations not relevant with respect to acts committed by third persons.

In support of its argument that the statute should be read as including that conduct, the State observes that an injury committed while a child is still *in utero* can produce criminal liability if the child is later born alive and, citing *Williams v. State,* 77 Md.App. 411, 550 A.2d 722 (1988), *aff'd,* 316 Md. 677, 561 A.2d 216 (1989), notes that the Legislature was cognizant of that precept when it first enacted the reckless endangerment law.

In *Williams,* the defendant shot an arrow at an intended victim. The arrow struck instead a bystander who was nine months pregnant and who died from a massive loss of blood caused by the wound. Her child was born alive but died shortly after birth as a derivative result of the mother's blood loss. In an opinion filed in December, 1988—just before commencement of the 1989 legislative session, at which the reckless endangerment statute was first enacted—the Court of Special Appeals concluded that the defendant could lawfully be convicted of two counts of manslaughter, one for the death of the mother and the other for the death of the child.

The court began by observing that manslaughter is a common law crime in Maryland and that Article 5 of the Maryland Declaration of Rights guarantees to the inhabitants of the State the common law of England that existed on July 4, 1776, subject, of course, to modification by statute and by this Court. There being no relevant statutory enactments or pronouncements from this Court on the particular issue, the Court of Special Appeals looked to the state of the law in Eighteenth Century England and discovered two divergent views—one first enunciated by Edward Coke and the other by Matthew Hale. Both men had served as Lord Chief Justice of the King's Bench and both had authored oft-cited commentaries on English common law. Coke is perhaps most famous (other than for admonishing King James that even he was not above the law) as the author of *The First Part of the Institutes of the Laws of England* (1628). Hale authored *Pleas of*

*the Crown* (1678), *History of the Pleas of the Crown* (1736–39), and *History of the Common Law of England* (1713).

Coke wrote that, if a person assaulted a pregnant woman and, as a result, killed the unborn child, it was not murder, but that, if the child was born alive and then died from the injuries inflicted, it *was* murder, "for in the law it [the child] is accounted a reasonable creature *in rerum natura,* when it is born alive ... and so was the law holden in Bracton's time." 3 Coke, INSTITUTES * 50 (1648), quoted in *Williams v. State, supra,* 77 Md.App. at 418, 550 A.2d at 725. The *Williams* court characterized Coke's view as the "born alive" rule. Hale believed otherwise—that it was not homicide, whether the child was killed *in utero* or died after being born alive. *See* 1 Hale, PLEAS OF THE CROWN 433 (1736).

After surveying the writings of later English and American commentators—Stephens, Blackstone, Hawkins, Warren, and Wharton—and the decisions of some English and American courts, the Court of Special Appeals adopted Coke's view and held that "when a child is born alive but subsequently dies as a result of injury sustained *in utero* the death of the child is homicide." *Id.* at 420, 550 A.2d at 726.

By affirming the intermediate appellate court's decision in *Williams v. State, supra,* 316 Md. 677, 561 A.2d 216, we ultimately sustained that view, though not until after the 1989 enactment. The importance of the case, from the State's perspective, is that the "born alive" rule enunciated by the Court of Special Appeals was before the Legislature when it considered and enacted the reckless endangerment statute, and that the General Assembly therefore likely intended to engraft that rule into the statute. In making the reckless endangerment of another person criminal, says the State, the Legislature must have intended to mirror the common law view of manslaughter and also criminalize conduct committed by anyone, including a pregnant woman, that recklessly endangers the later-born child.

The appellants respond that acceptance of the "born alive" rule with respect to the common law relating to homicides that arise from acts committed by others does not inform whether

the Legislature intended CL § 3–204(a)(1) to criminalize conduct committed by a pregnant woman that might endanger the child she is carrying. The statute itself, though certainly broad in its language, does not specifically address that question. In the absence of any direct evidence of legislative intent in this regard, either clear or implicit from the language of the statute, we look for other relevant indications, and there are some very cogent ones.

Notwithstanding occasional flights of fancy that may test the proposition, the law necessarily and correctly presumes that Legislatures act reasonably, knowingly, and in pursuit of sensible public policy. When there is a legitimate issue of interpretation, therefore, courts are required, to the extent possible, to avoid construing a statute in a manner that would produce farfetched, absurd, or illogical results which would not likely have been intended by the enacting body. Stated simply and in the affirmative, courts must attempt to construe statutes in a common sense manner. We have long and consistently held to that view. *See,* most recently, *Gilmer v. State,* 389 Md. 656, 663, 887 A.2d 549, 553 (2005); *Comptroller v. Citicorp,* 389 Md. 156, 169, 884 A.2d 112, 120 (2005); *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005); *Cain v. State,* 386 Md. 320, 328, 872 A.2d 681, 686 (2005).

Keeping in mind that recklessness, not intention to injure, is the key element of the offense, if, as the State urges, the statute is read to apply to the effect of a pregnant woman's conduct on the child she is carrying, it could well be construed to include not just the ingestion of unlawful controlled substances but a whole host of intentional and conceivably reckless activity that could not possibly have been within the contemplation of the Legislature—everything from becoming (or remaining) pregnant with knowledge that the child likely will have a genetic disorder that may cause serious disability or death, to the continued use of legal drugs that are contraindicated during pregnancy, to consuming alcoholic beverages to excess, to smoking, to not maintaining a proper and sufficient diet, to avoiding proper and available prenatal medical care, to

failing to wear a seat belt while driving, to violating other traffic laws in ways that create a substantial risk of producing or exacerbating personal injury to her child, to exercising too much or too little, indeed to engaging in virtually any injury-prone activity that, should an injury occur, might reasonably be expected to endanger the life or safety of the child. Such ordinary things as skiing or horseback riding could produce criminal liability. If the State's position were to prevail, there would seem to be no clear basis for categorically excluding any of those activities from the ambit of the statute; criminal liability would depend almost entirely on how aggressive, inventive, and persuasive any particular prosecutor might be.

Confirming the strong inference that the General Assembly did not intend CL § 3–204(a)(1) to include any of this kind of self-induced activity, including the ingestion of controlled substances, is the manner in which they actually dealt with that kind of activity when they chose to deal with it.

In the same 1989 session that produced the initial enactment of the reckless endangerment law, House Bill 809 was introduced. That bill would have expanded the definition of "abuse" to include the physical dependency of a newborn infant on any controlled dangerous substance for the purposes of the Family Law Article provisions requiring reporting and investigation of suspected child abuse. The bill was opposed by the Secretary of Human Resources, the American Civil Liberties Union (ACLU), and the Foster Care Review Board, and it died in the House Judiciary Committee.

In 1990, a number of bills were introduced on the subject, taking differing approaches. House Bill 1233 would have gone a step further; it would have included "physical injury to an unborn child resulting from the use by the child's mother during pregnancy of a controlled dangerous substance" as criminal child abuse. House Bill 689 was similar, except that (1) it referred to physical injury to "the child," rather than to an "unborn child," (2) it would have made that conduct a felony, and (3) it exempted women who participated in a drug abuse treatment program and subsequently abstained from

using any controlled substance. House Bill 1101 and Senate Bill 662 would have expanded the definition of both "child in need of assistance" under the Juvenile Causes law and "neglect" under the Family Law Article provisions requiring the reporting and investigation of child neglect, to include prenatal fetal exposure to a controlled substance.

All of those bills died in the House Judiciary Committee. The files on H.B. 1233 and H.B. 689 reveal opposition by the Department of Human Services. The Department observed (1) that it was often difficult to establish a cause-and-effect relationship between a woman's drug use and injuries to the fetus, (2) in most cases, a woman's use of drugs during pregnancy is the result of her inability to control her addiction, the absence of adequate treatment programs, or her lack of awareness of the possible effects of her drug use on the fetus, and (3) in those States where criminal sanctions exist for drug use by pregnant women, the data did not indicate any decrease in the number of drug-using pregnant women. It is noteworthy that the opposition to those bills that would have established criminal liability, from both State agencies and private groups that dealt with the problem of drug-addicted pregnant women and babies, was not that the bills were unnecessary because criminal liability already existed under the reckless endangerment law, but that the approach they embraced was not good public policy.

House Bill 1101 and Senate Bill 662 garnered more support, because they offered the prospect of services for drug-addicted babies. The problem seemed to be the anticipated cost of providing those services. In a post-session letter to the Secretary of Health and Mental Hygiene, the chairman of the Judiciary Committee urged that the Secretary reconvene a Drug Addicted Babies Task Force created in 1989 and promised that legislation would be forthcoming.

One or both approaches were before the Legislature in succeeding years—in 1991, 1992, 1995, 1996, and 1997. In 1997, by 1997 Md. Laws, ch. 367 and 368, the Legislature opted to address the problem in a tri-partite civil context. It

first attached to the definition of a "child in need of assistance" a presumption that a child is not receiving ordinary and proper care and attention if the child was born addicted to or dependent on cocaine, heroin, or a derivative of either, or was born with a significant presence of those drugs in his or her blood. That circumstance could be taken into account by a Juvenile Court in deciding whether the child is in need of assistance. Second, the bills amended the law pertaining to the termination of parental rights to add that circumstance, plus the parent's refusal to participate in a drug treatment program, as a consideration in determining whether termination is in the child's best interest.

Finally, the Legislature required the Departments of Human Resources and Health and Mental Hygiene to develop and implement pilot drug intervention programs for the mothers of children who were born drug-exposed. As part of that intervention program, the Department of Human Resources was required to file a child in need of assistance petition on behalf of a child who was born drug-exposed if the mother failed to complete drug treatment and she and the father were unable to provide adequate care for the child. *See* Maryland Code, § 3–818 of the Cts. & Jud. Proc. Article and §§ 5–323(d)(3)(ii) and 5–706.3 of the Family Law Article.

In the 2004 session, Senate Bill 349 and House Bill 802, both captioned as the Unborn Victims of Violence Act, were introduced. Among other provisions dealing with murder, manslaughter, and assault, they would have defined the term "another," as used in CL § 3–204(a)(1), to include an unborn child, thereby making it a criminal offense recklessly to create a substantial risk of death or serious physical injury to an unborn child. There was no exemption for the conduct of the child's mother, other than in the context of a legal abortion. Neither bill passed. *See also* House Bill 520 (2004), which also failed.

In 2005, the Legislature, in a more limited version of the 2004 bills, extended the law of murder and manslaughter to permit a prosecution for the murder or manslaughter of a

viable fetus. *See* 2005 Md. Laws, ch. 546, enacting CL § 2–103. The statute provides that such a prosecution is warranted only if the defendant intended to cause the death of or serious physical injury to the viable fetus or wantonly or recklessly disregarded the likelihood that the defendant's action would cause death or serious physical injury to the fetus. There are at least two important differences between the 2005 enactment and the failed 2004 bills. First, the 2005 Act did *not* encompass the reckless endangerment statute but dealt only with unlawful homicides. At least equally significant, and perhaps more so, the Legislature was careful, in § 2–103(f), to make clear that "[n]othing in this section applies to an act or failure to act of a pregnant woman with regard to her own fetus."

That provision was added to the bill specifically to allay concerns expressed by the Secretary of Health and Mental Hygiene, the ACLU, and the National Organization for Women that, absent such a provision, women might be subject to prosecution for not accessing available prenatal care or causing the death of a fetus by reason of reckless behavior during pregnancy, including a drug overdose. The ACLU letter pointedly observed:

> "Without such a clarification, the bill could encourage the policing of pregnancy by those attempting to control the conduct of pregnant women. All of the woman's conduct during and perhaps even before pregnancy could become subject to judicial scrutiny.... All of her conduct could be second-guessed in a court of law if something tragically happens to her viable fetus."

This sixteen-year history, from 1989 to 2005, shows rather clearly that, although a pregnant woman, like anyone else, may be prosecuted for her own possession of controlled dangerous substances, the General Assembly, despite being importuned on numerous occasions to do so, has chosen not to impose additional criminal penalties for the effect that her *ingestion* of those substances might have on the child, either before or after birth. It has consistently rejected proposals

that would have allowed such conduct to constitute murder, manslaughter, child abuse, or reckless endangerment. In doing so, the Legislature obviously gave credence to the evidence presented to it that criminalizing the ingestion of controlled substances—in effect criminalizing drug addiction for this one segment of the population, pregnant women—was not the proper approach to the problem and had, in fact, proved ineffective in other States in deterring either that conduct or addiction generally on the part of pregnant women. It deliberately opted, instead, to deal with the problem by providing drug treatment programs for pregnant women and using the child in need of assistance and termination of parental rights remedies if the women failed to take advantage of the treatment programs and, as a result, were unable to provide proper care for the child.

Given the exemption added to the 2005 legislation, it would be an anomaly, indeed, if the law were such that a pregnant woman who, by ingesting drugs, recklessly caused the death of a viable fetus would suffer no criminal liability for manslaughter but, if the child was born alive and did not die, could be imprisoned for five years for reckless endangerment. A *non-fatal* injury resulting from reckless conduct would be culpable; a *fatal* injury resulting from the same reckless conduct would not be.

Maryland is not the only State to address this issue. These kinds of cases—prosecutions for reckless endangerment, child abuse, or distribution of controlled substances based on a pregnant woman's ingestion of a controlled dangerous substance, or, in some cases, excessive amounts of alcohol—have arisen in other States, and the overwhelming majority of courts that have considered the issue have concluded that those crimes do not encompass that kind of activity. Indeed, only one State—South Carolina—has so far held to the contrary. *See generally* James G. Hodge, Jr., *Prosecution of Mother for Prenatal Substance Abuse Based on Endangerment of or Delivery of Controlled Substance to Child,* 70

A.L.R.5th 461 (1999) and Carol Sovinski, *The Criminalization of Maternal Substance Abuse: A Quick Fix to a Compelx Problem,* 25 PEPP. L.REV. 107 (1997).[3]

In conformance with this nearly universal view, but most particularly in light of the way in which the Maryland General Assembly has chosen to deal with the problem, we hold that it was not the legislative intent that CL § 3–204(a)(1) apply to prenatal drug ingestion by a pregnant woman. We therefore reverse the judgments entered by the Circuit Court.

**JUDGMENTS IN NOS. 91 (KILMON) AND 106 (CRUZ) REVERSED; TALBOT COUNTY TO PAY THE COSTS IN EACH CASE.**

---

**3.** For specific holdings, *see Johnson v. Florida,* 602 So.2d 1288 (Fla. 1992) (statute prohibiting delivery of controlled substance to person under 18 not applicable to ingestion of controlled substance prior to giving birth) and *cf. State v. Ashley,* 701 So.2d 338 (Fla.1997) (confirming *Johnson* ); *State v. Gray,* 62 Ohio St.3d 514, 584 N.E.2d 710 (1992) (statute prohibiting creation of substantial risk to health or safety of child not applicable to abuse of drugs during pregnancy); *State v. Aiwohi,* 109 Hawai'i 115, 123 P.3d 1210, 1214 (2005) (manslaughter statute not applicable; court recognizes that "overwhelming majority of jurisdictions confronted with the prosecution of a mother for her own prenatal conduct, causing harm to the subsequently born child, refuse to permit such prosecutions"); *Com. v. Welch,* 864 S.W.2d 280 (Ky. 1993) (legislature did not intend child abuse statute to apply to prenatal self-abuse that caused drugs to be transmitted through umbilical cord to child); *Sheriff v. Encoe,* 110 Nev. 1317, 885 P.2d 596 (1994) (child endangerment statute does not apply to transmission of illegal substances from mother to newborn through umbilical cord); *Reinesto v. Superior Court,* 182 Ariz. 190, 894 P.2d 733 (1995) (child abuse statute not applicable); *Reyes v. Superior Court,* 75 Cal.App.3d 214, 141 Cal. Rptr. 912 (Cal.App.1977) (child endangerment statute not applicable); *People v. Hardy,* 188 Mich.App. 305, 469 N.W.2d 50 (1991) (statute prohibiting delivery of cocaine did not apply to transmission of cocaine through umbilical cord from mother to child); *People v. Morabito,* 151 Misc.2d 259, 580 N.Y.S.2d 843 (City Ct.1992) (child endangerment statute not applicable to that circumstance); *Collins v. State,* 890 S.W.2d 893 (Tex.App.1994) (reckless injury statute not applicable); *State v. Deborah J.Z.,* 228 Wis.2d 468, 596 N.W.2d 490 (1999) (reckless injury statute not applicable to ingestion of excessive amount of alcohol during pregnancy causing injury to child). *Compare Whitner v. State,* 328 S.C. 1, 492 S.E.2d 777 (1997), *cert. denied,* 523 U.S. 1145, 118 S.Ct. 1857, 140 L.Ed.2d 1104 (1998) (holding that woman could be prosecuted for endangering fetus by prenatal substance abuse).